**FALLSTON GENERAL HOSPITAL, Limited Partnership**

v.

**Patricia Roberts HARRIS, Secretary of Health, Education and Welfare and Robert A. Derzon, et al.**

**Civ. No. HM78–1619.**

United States District Court,
D. Maryland.

Nov. 9, 1979.

A. Dwight Pettit, Baltimore, Md., Kathleen Houston Drummy, Los Angeles, Cal., for plaintiff.

Russell T. Baker, Jr., U. S. Atty., for Dist. of Maryland; Michael J. Travieso, Asst. U. S. Atty. for Dist. of Maryland, Baltimore, Md.

Diane C. Moskal, Asst. Regional Atty., Dept. of Health, Ed. and Welfare, Region III, Philadelphia, Pa., for defendants.

HERBERT F. MURRAY, District Judge.

This case arises under Title XVIII of the Social Security Act, 42 U.S.C. Section 1395, *et seq.,* which establishes a program of federal reimbursement for medical care for the aged and disabled, commonly known as "Medicare." Specifically, this litigation involves Part A of the Medicare Act. Part A provides hospital insurance benefits such as inpatient hospital care and post-hospital or home health care. Part A also permits health care providers, for example, hospitals, skilled nursing facilities and home health agencies, to be reimbursed by the Secretary of Health, Education and Welfare for the "reasonable cost" of covered services rendered by the providers to Medicare beneficiaries.

Payment of reasonable costs is normally made directly to the provider either by the Secretary or, more commonly, through cer-

tain private organizations such as private insurance companies and the Blue Cross Association through its local plans, acting as fiscal intermediaries pursuant to contract with the Secretary, 42 U.S.C. Section 1395h. The primary duty of the fiscal intermediary is the processing of claims and the payment of funds to the provider. The payment function necessarily involves ascertaining the "reasonable cost" of services rendered to Medicare beneficiaries.

42 U.S.C. Section 1395x(v)(1)(A) vests broad discretion in the Secretary to promulgate regulations for the purpose of determining what constitutes "reasonable costs." These regulations are found in 42 C.F.R. Section 405.401, *et seq*. (1977) and have been interpreted by the Secretary in a series of Health Insurance Manuals. Reasonable costs generally include all necessary and proper expenses incurred in rendering services, such as salaries, supplies, administrative costs and maintenance, 42 C.F.R. Section 405.451.

Section 405.427 of the regulations provides that the reasonable cost of goods, services, and facilities furnished to a provider by a "related organization" shall be the cost to the party who supplies such goods, services and facilities rather than the cost actually paid by the provider. In this case, the Secretary relied on the related organization regulation to disallow plaintiff's lease expense as a reasonable cost of providing Medicare services.

The facts of this case are not in dispute. Plaintiff Fallston General Hospital, which I will refer to in this opinion as "Fallston," is a limited partnership organized under Maryland law to operate Fallston General Hospital in Fallston, Maryland. Fallston is a duly licensed proprietary hospital and a certified provider of services under the Medicare program. The general partner of the Fallston partnership is Fallston Medical Complex Operating Corporation, a Maryland corporation organized and incorporated in July 1972. The general partner is owned wholly by Doctor Kermit P. Bonovich and Messrs. Nicholas B. Mangione, Richard D. Poteet and Henry G. Smeltzer. The limited partners of Fallston consist of 45 licensed medical personnel who own 30 limited partnership units.

Fallston leases its hospital facilities from Fallston Medical Complex General Partnership, to which I will refer hereafter as "the real estate partnership," 95 percent of which is owned by the four owners of the general partner of Fallston.

This case originated as a dispute between the plaintiff and its fiscal intermediary, Blue Cross-Blue Shield of Maryland, over plaintiff's cost report for the fiscal year ending December 31, 1975. In August 1977, the intermediary notified plaintiff that plaintiff would be denied Medicare reimbursement for its approximately $1,150,000 in rental payments to the real estate partnership.

On October 10, 1977, plaintiff filed a request for a hearing before the Provider Reimbursement Board as authorized in 42 U.S.C. Section 1395oo. A hearing was held in February 1978, and as a result of this hearing, the Board affirmed the intermediary's adjustments, holding that Fallston was entitled to reimbursement only for depreciation, interest and other ownership costs incurred by the real estate partnership. The Board's decision was reviewed and affirmed by the Administrator of the Health Care Administration in June 1978. This decision constituted the Secretary's final decision on Fallston's claim. On August 30, 1978, Fallston filed the present action pursuant to Section 1395oo (f) to obtain judicial review of the Secretary's determination.

The dispute in this case focuses on whether Fallston and the real estate partnership are "related" within the meaning of regulation Section 405.427. Plaintiff contends that even if the two entities are found to be related, however, plaintiff should nevertheless be entitled to reimbursement for rental expenses if such expenses were reasonable.

Plaintiff's final contention is that the Secretary's decision is inconsistent with the Medicare statute and with reimbursement regulations. Review in this case is governed by the provisions of the Administrative Procedure Act, 5 U.S.C. Section 706.

Section 1395x(v)(1)(A) of Title 42 provides that, "The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services. . . ." 42 C.F.R. Section 405.427 sets forth the principles applicable to "related organizations."

Subpart (a) provides: "*Principle.* Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization."

Subpart (c)(2) states:

"Application. . . . Where the provider obtains items of services, facilities, or supplies from an organization, even though it is a separate legal entity, and the organization is owned or controlled by the owner or owners of the provider, in effect the items are obtained from itself. An example would be a corporation building a hospital or a nursing home and then leasing it to another corporation controlled by the owner. Therefore, reimbursable cost should include the costs of these items at the cost to the supplying organization."

The following definitions are provided in the regulation:

"(1) *Related to provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

"(2) *Common ownership.* Common ownership exists when an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

"(3) *Control.* Control exists where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution."

The Secretary found that Fallston was related to the real estate partnership under both the common ownership and control tests, even though the language of the regulation requires that only one of the tests need be met to establish related organization status. Because the court is of the view that substantial evidence supports the Secretary's finding that the control test is met, the court need not consider at this time whether Fallston and the real estate partnership are related by reason of common ownership.

The undisputed facts show that the four individuals who owned 100 percent of Fallston's general partner owned 95 percent of the real estate partnership that leased the hospital facility to Fallston. Defendant maintains, and the Secretary found, that because plaintiff was, in fact, controlled by the general partner, plaintiff, in effect, was renting the facility from itself by virtue of the interlocking ownership of the general partner and the real estate partnership. The issue raised by plaintiff is whether *it* was, in fact, controlled by the general partner. There is no issue as to whether control existed between the general partner and the real estate partnership, since the persons involved in these two entities were virtually the same.

The Fallston limited partnership agreement, as amended on September 13, 1974, is particularly revealing as to the control exercised by the four individuals constituting the general partner and 95 percent of the real estate partnership. This control existed both in terms of general management and operation of Fallston and in terms of the August 1974 lease with the real estate partnership. Among pertinent provisions are the following:

Section 8(a) provides that, ". . . the General Partner shall have the exclusive right and power to manage and operate the Partnership and to do all things necessary to carry on the business of the Partnership . . . ."

Section 8(b) provides:

"The General Partner is specifically authorized and empowered, on behalf of the partnership, without any further consent of

the Limited Partners, to do any act or execute any document or enter into any contract or any agreement of any nature necessary or desirable, in the opinion of the General Partner, in pursuance of the purposes of the Partnership including, without limitation, to enter into and to perform the following agreements:

"(i) A lease agreement by and between the Partnership and the Real Estate Partnership . . . in which the partners are substantially the identical persons who are stockholders of the General Partner . . ."

Section 5(e) gives the general partner the right to determine who may become a limited partner. Section 5(f) makes the general partner the attorney-in-fact for the limited partners. Finally, Section 5(h) authorizes the general partner to borrow funds on behalf of the partnership.

Plaintiff has argued that the issue is not whether the four individuals owning interests in the real estate partnership and the general partner had the power to influence Fallston's day-to-day management functions, but whether they had the power to significantly influence Fallston's decision to enter into and perform the lease. *See Northwest Community Hospital, Inc. v. Califano,* 442 F.Supp. 949 (S.D.Iowa 1977). Even under this test, however, the four individuals exercised significant control over Fallston.

When a prospectus offering Fallston limited partnership interests for sale was issued on September 13, 1974, the partnership consisted of the general partner and two initial limited partners. The partnership agreement, as already indicated, contained an express provision authorizing the general partner to perform the lease agreement. No power was given to the limited partners to change this provision, even though, if the general partner wished to amend the lease, consent of 75 percent of the limited partners was necessary. The initiative to amend the lease was a power apparently reserved to the general partner, however. The limited partners could only consent or refuse to consent to the initiative taken by the general partner. Once the limited part-

ners invested in Fallston, they had no voice in whether the lease of September 1974 would be performed and could not initiate action to amend the lease.

Fallston argues further that even if power over the daily operations were the test of control, the general partner did not exercise such control over the daily operations of Fallston. This argument is based on the fact that the general partner had contracted with a management company for the performance of management duties during 1975. The argument ignores the clear language of regulation Section 405.427, which defines control as "the power . . . significantly to influence or direct the actions or policies of an organization or institution." The general partner, pursuant to the partnership agreement, plainly had the *power* to direct the actions of Fallston, and the fact that it delegated this power by contract is irrelevant.

As pointed out by both sides, the identity between the general partner and the real estate partnership was apparently a matter of business necessity. This, of course, does not necessarily mean that such identity was illegal or improper. However, regardless of how unavoidable these partnership arrangements may have been to the successful operation of the hospital, the fact remains that the Medicare regulations prohibit federal reimbursement of certain payments made by a provider to a related organization.

In this case, the court finds that there was substantial evidence from which the Secretary could conclude that Fallston was subject to the provisions of regulation Section 405.427 by reason of its rental payments to the real estate partnership, an organization to which it was related because of the significant extent to which both partnerships were controlled by four individuals.

Plaintiff contends that even if Fallston and the real estate partnership are viewed as related organizations, the Secretary acted arbitrarily and capriciously in failing to consider the reasonableness of the rent paid by Fallston.

Counsel for the defendant has referred to Section 405.427 as interpreted in Section 1006 of the Health Insurance Manual. Section 1006 states:

"A provider may lease a facility from a related organization within the meaning of the principles of reimbursement. In such case, the rent paid to the lessor by the provider is not allowable as cost. However, the provider would include in its costs the costs of ownership of the facility. Generally, these would be costs such as depreciation, interest on the mortgage, real estate taxes and other expenses attributable to the leased facility. The effect is to treat the. facility as though it were owned by the provider."

Fallston argues that since the purpose of the regulation is to prevent abuse through non-competitive, unreasonable self-dealing between a provider and a related organization, the Secretary's interpretation of the regulation is unfair in this case because the lease payments at issue *were* reasonable.

The Medicare program, however, is liable for reimbursing only the *necessary* costs of efficiently delivered, covered health services, 42 U.S.C. Section 1395x(v)(1)(A). The regulations, as already discussed, establish that payments to related organizations are unnecessary—except that the cost to the supplying organization may be reimbursed. In this case, the only costs to the real estate partnership in providing the hospital facility to Fallston were the expenses mentioned in Section 1006 of the Health Insurance Manual. Thus, the Secretary's interpretation of regulation Section 405.427 appears correct. The fact that the lease terms were economically reasonable does not avoid the conclusion that lease payments were unnecessary for Medicare reimbursement purposes.

Plaintiff argues that the case of *St. John's Hickey Memorial Hospital, Inc. v. Califano,* 599 F.2d 803 (7th Cir. 1979) precludes this result because it burdens non-Medicare patients with costs which are at least partially attributable to Medicare beneficiaries. It is noteworthy, however, that this case actually held that only necessary costs may be reimbursed by the program. Parity between Medicare and non-Medicare patients cannot be achieved in derogation of the governing statute and regulations.

For all the reasons I have just outlined, the court will grant the defendant's motion for summary judgment and deny the plaintiff's motion for summary judgment and will ask government counsel to submit an appropriate order within ten days.