NORTHWEST HOSPITAL,
INC., Plaintiff,

v.

HOSPITAL SERVICE CORPORATION
et al., Defendants.

No. 75 C 2803.

United States District Court,
N. D. Illinois, E. D.

Oct. 29, 1980.

George R. Bieber, Bieber & Spitzer, Chicago, Ill., for plaintiff.

Mary A. Thomas, Asst. U. S. Atty., Chicago, Ill., Stephen B. Weiss, Health Care Financing and Human Development Services Division, Baltimore, Md., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Plaintiff Northwest Hospital, Inc. ("Northwest") has challenged the determination by the Commissioner of Social Security ("Commissioner") denying payment of certain items claimed as reimbursable costs under the Medicare program for Northwest's fiscal year ended April 30, 1974. With the facts not in dispute, each side has moved for summary judgment. For the reasons stated in this memorandum opinion and order, the motion by defendants is granted in part and denied in part, and Northwest's motion is denied.

### Facts

Northwest has participated in the Medicare program since its inception in 1966. Under the federal statute, a "provider" facility such as Northwest is reimbursed for the reasonable costs of providing care to the program's beneficiaries. 42 U.S.C. § 1395f(b). Generally a fiscal intermediary such as Hospital Service Corporation is used to determine proper reimbursement for a provider.[1] 42 U.S.C. § 1395h. To avoid liquidity problems, estimated payments are made to the provider at least once a month with subsequent adjustments for overpayments and underpayments. 42 U.S.C. §§ 1395g, 1395x(v)(1)(A)(ii). Final determination of a provider's reimbursable costs is made by the fiscal intermediary based, on the submission of a cost report after the end of each fiscal year. 42 C.F.R. § 405.-406(b).

After a dispute arose regarding the April 30, 1974 fiscal year,[2] Northwest requested a hearing before the Provider Reimbursement Review Board ("PRRB"). 42 U.S.C. § 1395 oo (a). PRRB's determination was then reviewed by the Commissioner, and it is his decision of May 28, 1976 that Northwest asks this Court to review. 42 U.S.C. § 1395 oo (f).

Northwest challenges four determinations by the Commissioner:

1. Northwest is not entitled to depreciation expense based on the fair market value of the assets acquired from its corporate predecessor, a for–profit corporation with the same corporate name ("Northwest I"). Instead, the depreciation expense must be based on the depreciated historical cost to Northwest I.

2. Northwest is not entitled to deduct interest expense on notes given in exchange for the stock of Northwest I.

3. Northwest is not entitled to claim as allowable cost the payments made to its auxiliary for the services of certain nonpaid workers.

4. Northwest is not entitled to claim as allowable cost the interest expense incurred on loans used for the construction of a parking lot and professional building.

1. Defendant Blue Cross Association was originally the fiscal intermediary, but it delegated that function to defendant Hospital Service Corporation.

2. Northwest also disputed determinations of reimbursable cost for several other fiscal years, but all those claims have been transferred to the Court of Claims.

*Depreciation; Interest on Purchase
Price Notes*

Each of the first two issues arises from the manner in which Northwest acquired ownership of its hospital operations. Northwest I was a for–profit corporation owned and administered by three men: Pasquale DeMarco (its hospital administrator), Dr. Michael J. Nechtow (its medical director) and John T. Ryan (its legal counsel). In 1965 they proposed a plan to convert the hospital to a not–for–profit institution and ordered appraisals of its assets for that purpose.

On January 18, 1966 the three owners of Northwest I joined with four civic leaders from the community and formed Northwest as a non–profit corporation (all seven men were its directors, with DeMarco, Dr. Nechtow and Mr. Ryan retaining their operating positions). On January 27, 1966 Northwest and Northwest I's stockholders executed an agreement under which Northwest agreed to purchase all the stock in Northwest I, paying $100,000 in cash and delivering $4,900,000 in 14–year notes bearing 4% interest.

That agreement was specifically conditioned on Northwest's receipt of an Internal Revenue Service ruling granting it Section 501(c)(3) tax–exempt status. Northwest did not receive the tax ruling until December 20, 1967, and the purchase transaction was closed January 2, 1968.

■ As a threshold matter, Northwest argues that the Medicare regulations covering depreciation and interest are·not applicable to this case. Both the Medicare statute and the regulations took effect in 1966 (the statute in July and the regulations in November). Northwest argues that the

sale of the hospital took place on January 27, 1966 (the date of the contract), so that the regulations do not apply.

However, execution of the agreement was not the legally operative fact. Consummation of the sale was conditioned on obtaining a favorable IRS ruling—and that was a critical substantive condition, for the entire purpose of the transaction would have been frustrated if tax–exempt status had not been forthcoming. It is *purchases* of hospitals that the regulations govern; and while there was a conditional *agreement* to purchase before the enactment of the statute and its regulations, it is clear that the actual *purchase* was not completed until January 2, 1968.

*1. Depreciation*

Depreciation costs, like all other elements of reimbursable costs, are a function of the "reasonable cost of . . . services" delivered by the provider. 42 U.S.C. § 1395x(v).[3] In turn, the specifics of the reimbursement program are governed by the regulations issued by the Secretary. In this case Northwest argues that the purchase price under its contract should be the base for calculating depreciation, while the Commissioner held that Northwest I's depreciated historical cost was the proper measure.

Depreciation allowances generated by the sale of an ongoing facility are calculated on a basis defined by 42 C.F.R. § 405.415(g):[4]

*Establishment of cost basis on purchase of facility as an ongoing operation—(1) Assets acquired after July 1, 1966 and before August 1, 1970.* The cost basis for the assets of a facility purchased as an ongoing operation after July 1, 1966, and

---

**3.** Appendix A contains the complete text of Subsection (v)(1)(A), which is the applicable provision.

**4.** Section 405.427, which covers "costs applicable to services, facilities, and supplies furnished to the provider . . . ," might also be deemed applicable. There is a difference of view as to whether that section applies only to ongoing relationships between a hospital and a supplier, *South Boston General Hospital v. Blue Cross of Virginia,* 409 F.Supp. 1380 (W.D.Va.1976), or also extends to a single–transaction purchase

of a hospital facility, *Hillside Community Hospital of Ukiah v. Mathews,* 423 F.Supp. 1168 (N.D.Cal.1976). *Hillside,* which represents perhaps the broadest application of Section 405.-427 to date, involved an organization that purchased a hospital building and land from one party and the assets of the hospital from a separate seller. Here Northwest purchased an entire ongoing operation from one seller. This Court need not determine the full scope of Section 405.127, because it reaches the same result under Section 405.415(g) that the former section would have produced.

before August 1, 1970, shall be the lowest of:

(i) The total price paid for the facility by the purchaser, as allocated to the individual assets of the facility; or

(ii) The total fair market value of the facility at the time of the sale, as allocated to the individual assets; or

(iii) The combined fair market value of the individually identified assets at the time of the sale.

\*    \*    \*    \*    \*    \*

(3) *Transactions other than bona fide.* If the purchaser cannot demonstrate that the sale was bona fide, in addition to the limitations specified in paragraphs (g)(1) and (2) of this section, the purchaser's cost·basis shall not exceed the seller's cost basis, less accumulated depreciation.

As might be expected, the dispute focuses on the meaning of the term "bona fide":

(1) Northwest argues that "bona fide" means nothing more than bargaining conducted between well informed buyers and sellers. Thus, it contends, the fair price and favorable terms are conclusive as to the bona fides of the sale, so that Northwest must be permitted to use the $5 million purchase price as its depreciation base.

(2) Defendants assert that a "bona fide" sale must consist of an arm's length transaction between *unrelated* parties. Because the three stockholder–director–operators of Northwest I continued as directors and as the controlling operators of Northwest, Hospital Service argues the transaction was between related parties and thus not a "bona fide" purchase, so that

Northwest I's depreciated historical cost must be the depreciation base. To buttress that position, defendants rely on a 1972 interpretative letter sent by the Department to all fiscal intermediaries:

... A number of proprietary providers have recently converted to a non–profit status. Such conversion, of course, constitutes a change of ownership for Medicare certification purposes. The change of ownership would not, however, necessarily constitute a *bona fide* sale that would result in revaluation of provider assets under Medicare regulations. To be considered a bona fide sale, a transaction must result from arm's length bargaining between distinct and unrelated buyer and seller entities and result in a change in the actual control of the assets. Where the purchaser cannot demonstrate that change in ownership constituted a bona fide sale of assets, the new owner's cost basis shall not exceed the previous owner's cost basis less accumulated depreciation recognized under the program.

▮ This Court agrees with defendants that "bona fide," when viewed in the context of the statute and its regulations, includes the concept of unrelatedness.[5] Where unrelated parties deal with each other at arm's length, there can be no question of the legitimacy of the cost to the provider as a base for future depreciation. But where self–dealing is involved, the same assurances do not exist to mandate an exception to the general rule prohibiting a revaluation of assets.[6]

---

5. In view of this interpretation, this Court does not have to reach the issue whether the Intermediary Letter should have been issued in accordance with the Administrative Procedure Act, 5 U.S.C. § 553. It may be noted that one court that has considered that issue upheld the validity of an Intermediary Letter as a valid *explanation* of a regulation, so that it did not have to be issued under the procedures set out in the A.P.A. *Schroeder Nursing Care, Inc. v. Mutual of Omaha Ins. Co.,* 311 F.Supp. 405 (E.D.Wis.1970).

6. Indeed one of the very. aspects of the Northwest–Northwest I sale stressed by Northwest

illustrates the unreliability of a related–parties transaction as "bona fide." Northwest emphasizes that the 4% interest rate "was substantially below the current prime rate charged by banks at the time." Familiar principles from the income and estate tax fields teach us that the fair market value of $4.9 million in bargain–interest–rate *subordinated* long-term notes is well below their face value, so that the *true* cost to Northwest was substantially less than the claimed $5 million in any case. Experience also teaches us that going–business appraisal is not a science but highly judgmental within wide ranges (and the same is true to a substantial extent as to real estate appraisals, absent

Section 405.427 defines "related parties," and that definition should be equally applicable to section 405.415. It provides that "[r]elated to the provider means that the provider to a significant extent is associated or affiliated with or has control or is controlled by the organization. . . ."

■ Northwest challenges the finding of the Commissioner that Northwest and Northwest I were related parties. But because the proper standard was applied, the Commissioner's determination that the parties were related is a finding of fact. Under the provisions of the Administrative Procedure Act a court can only overturn that kind of finding if "unsupported by substantial evidence . . ." 5 U.S.C. § 706 (2)(E). As the PRRB hearing established, Northwest's Board of Directors comprises the three owners of Northwest I plus four additional members chosen by the original owners. Those three original owners retained their positions in the hospital, and the Commissioner found that Hospital Administrator DeMarco has been the "dominant figure in both Providers [and] has the power to influence and direct the operations and policies of the non–profit Provider." Several courts have upheld findings of relatedness in similar situations. *See Medical Center of Independence v. Harris*, 628 F.2d 1113 (8th Cir., 1980); *Chelsea Community Hospital v. Michigan Blue Cross*, 436 F.Supp. 1050 (E.D.Mich.1977); *Hillside Community Hospital of Ukiah v. Mathews*, 423 F.Supp. 1168 (N.D.Cal.1976); *Schroeder Nursing Care, Inc. v. Mutual of Omaha*, 311 F.Supp. 405 (E.D.Wis.1970).

In summary, this Court finds the Commissioner's finding of related parties supported by highly probative substantial evidence and upholds the Commissioner's determination that Northwest must use Northwest I's depreciated historical cost of the hospital in calculating its own depreciation.

### 2. Interest on the Purchase Price

■ Interest on the unpaid purchase price of the hospital involves considerations similar to those just discussed. Generally 42 C.F.R. § 405.419(a) provides for reimbursement of interest payments:

> *Principle.* Necessary and proper interest on both current and capital indebtedness is an allowable cost.

But Section 405.419(c) provides a "related party" exception to that rule:

> *Borrower–lender relationship.* (1) To be allowable, interest expense must be incurred on indebtedness established with lenders or lending organizations not related through control, ownership, or personal relationship to the borrower. Presence of any of these factors could affect the "bargaining" process that usually accompanies the making of a loan, and could thus be suggestive of an agreement on higher rates of interest or of unnecessary loans.

For the same reasons already stated regarding depreciation, this Court upholds the Commissioner's finding that the parties were sufficiently related so as to prevent full reimbursement of interest expenses under Section 405.419.

However, under the circumstances of this case, the total disallowance of interest urged by defendants exceeds the statutory mandate that requires the reimbursement of reasonable costs. As already discussed, the 4% interest rate is unquestionably not a prohibited "higher rate of interest." As for the other factor mentioned by the regulation, the loan clearly cannot be characterized as "unreasonable." [7]

current and highly comparable sales). At best appraisals are a moderately acceptable substitute when the assurances of market value through an arm's length sale are unavailable. Because of the differences between capital gain rates and ordinary income rates for tax purposes, it is well known that controlled transactions are often structured with a "long price" and "low interest" so that the same total dollars afford a seller more favorable tax treatment. We need not impugn the motives of the stockholder–sellers here; what *is* plain is that

the problems of verification posed to the Commissioner by non–arm's length–transactions do provide a reasonable underpinning for a rule prohibiting a step–up in basis between related parties.

7. If Northwest were a for–profit enterprise, the disallowance of interest expense under the "related party" exception would cause the principal of the loan to be treated as invested funds in computing the return on equity capital to which a provider is entitled. That return is

To parallel the treatment already approved for depreciation, the allowable amount of the loan should be treated as the excess of Northwest I's depreciated historical cost over the $100,000 paid in cash when the transaction was closed. Interest is allowable on that excess at the 4% rate under Section 405.419(a). To that extent Section 405.419(c) is unreasonable and invalid as applied to this case, and to the same extent defendants' motion for summary judgment is denied.

### Non–Paid Workers

■ 42 C.F.R. § 405.424 covers the third issue presented for review, involving the work performed in the hospital by members of a volunteer women's auxiliary:

(a) *Principle.* The value of services in positions customarily held by full–time employees performed on a regular, scheduled basis by individuals as nonpaid members of organizations under arrangements between such organizations and a provider for the performance of such services without direct remuneration from the provider to such individuals is allowable as an operating expense for the determination of allowable cost subject to the limitation contained in paragraph (b) of this section. The amounts allowed are not to exceed those paid others for similar work. Such amounts must be identifiable in the records of the institutions as a legal obligation for operating expenses.

(b) *Limitations; services of nonpaid workers.* The services must be performed on a regular, scheduled basis in positions customarily held by full–time employees and necessary to enable the provider to carry out the functions of normal patient care and operation of the institution. The value of services of a type for which providers generally do not remunerate individuals performing such services is not allowable as a reimbursable cost under the title XVIII health insurance program. For example, donated services of individuals in distributing books and magazines to patients, or in

serving in a provider canteen or cafeteria or in a provider gift shop, would not be reimbursable.

Based on that regulation, the Commissioner denied reimbursement for the value of the work performed by the members of the women's auxiliary.

At various phases of the administrative proceeding, three different arguments were made in support of defendants' position. First, defendants argue that the services performed were of the kind normally undertaken by volunteers and not related to patient care or essential administrative tasks. Second, defendants relied on Section 704.1 of the Provider Reimbursement Manual, which permits reimbursement for volunteer workers only if the individuals work for a minimum of twenty hours per week, a requirement not met by the members of Northwest's women's auxiliary. Finally, defendants point out that all of the money that the hospital paid to the women's auxiliary was returned in the form of donations to the hospital, so that there was no actual cost to Northwest.

In this Court's view, the last point is dispositive of the matter. As the last sentence of Section 405.424(a) makes clear, reimbursement is permitted only for *sums paid* to organizations that provide volunteer workers. Section 405.424(c), which provides an example of proper reimbursement bears this out (emphasis added):

(c) *Application.* The following illustrates how a provider would determine an amount to be allowed under this principle: The prevailing salary for a lay nurse working in Hospital A is $5,000 for the year. The lay nurse receives no maintenance or special perquisites. A sister working as a nurse engaged in the same activities in the same hospital receives maintenance and special perquisites which cost the hospital $2,000 and are included in the hospital's allowable operating costs. The hospital would then include in its records an additional $3,000 to

unavailable to a non–profit provider. Thus the position asserted by defendants would involve unequal treatment of profit and non–profit

making organizations, in violation of Section 405.402(b)(5).

bring the value of the services rendered to $5,000. *The amount of $3,000 would be allowable where the provider assumes obligation for the expense under a written agreement with the sisterhood or other religious order covering payment by the provider for the services.*

Even more fundamentally, the statute itself only permits reimbursement for reasonable *costs.* Under the circumstances here, where Northwest has sustained no actual cost, reimbursement would be impermissible.

### Interest on Loans Incurred for Capital Improvements

■ Northwest incurred interest expense in connection with the construction of a parking lot and professional building. Even though it had an unrestricted funded depreciation account of more than $2 million, more than enough to pay for the capital improvements, it chose to fund the project by securing a loan. Accordingly, the question is whether interest, normally an allowable expense under Section 405.419, becomes an unreimbursable cost because the loan was not "necessary":

(a) *Principle.* Necessary and proper interest on both current and capital indebtedness is an allowable cost.

(b) *Definitions . . .*

    (a) *Necessary.* Necessary requires that the interest:

    (i) Be incurred on a loan made to satisfy a financial need of the provider. Loans which result in excess funds or investments would not be considered necessary.

    (ii) Be incurred on a loan made for a purpose reasonably related to patient care.

We thus deal with the proper interpretation of a regulation. In *Udall v. Tallman,*

380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965), the Supreme Court held that deference is to be given to an administrative agency's interpretation of a statute, and that when the interpretation of a regulation is involved "deference is even more clearly in order."

Northwest has failed to demonstrate any basis for overturning the decision of the Commissioner. It had adequate working capital from which the construction project could have been funded. Of course it could exercise its business judgment by obtaining a loan instead, but it cannot fairly impose the cost of that discretionary choice on the Medicare program.[8] Accordingly, the Commissioner did not abuse his discretion in determining that the interest was not the "necessary and proper interest" required by Section 405.419.

### Conclusion

There is no genuine issue as to any material fact. Defendants are entitled to judgment and are hereby granted final judgment as a matter of law in all respects except for their excess claim for disallowance of interest on Northwest's purchase price, as previously discussed. Defendants are also allowed costs of this action. If defendants desire the entry of a final judgment order other than this memorandum opinion and order, they are directed to present such an order on or before November 14, 1980.

### APPENDIX A

(v)(1)(A) The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health services, and shall

---

**8.** Northwest has elected to retain its depreciation fund for replacement only of the depreciable assets it already owns. In so doing, it derives a special benefit under the last sentence of 42 C.F.R. § 405.415(e):

(e) *Funding of depreciation.* Although funding of depreciation is not required, it is strongly recommended that providers use this mechanism as a means of conserving funds for replacement of depreciable assets, and coor-

dinate their planning of capital expenditures with areawide planning activities of community and State agencies. As an incentive for funding, investment income on funded depreciation will not be treated as a reduction of allowable interest expense.

If it also received reimbursement for interest on the loan it chose to obtain for its improvement project, it would be obtaining an improper double benefit.

be determined in accordance with regulations establishing the method or methods to be used, and the items to be included, in determining such costs for various types or classes of institutions, agencies, and services; except that in any case to which paragraph (2) or (3) applies, the amount of the payment determined under such paragraph with respect to the services involved shall be considered the reasonable cost of such services. In prescribing the regulations referred to in the preceding sentence, the Secretary shall consider, among other things, the principles generally applied by national organizations or established prepayment organizations (which have developed such principles) in computing the amount of payment, to be made by persons other than the recipients of services, to providers of services on account of services furnished to such recipients by such providers. Such regulations may provide for determination of the costs of services on a per diem, per unit, per capita, or other basis, may provide for using different methods in different circumstances, may provide for the use of estimates of costs of particular items or services, may provide for the establishment of limits on the direct or indirect overall incurred costs or incurred costs of specific items or services or groups of items or services to be recognized as reasonable based on estimates of the costs necessary in the efficient delivery of needed health services to individuals covered by the insurance programs established under this subchapter, and may provide for the use of charges or a percentage of charges where this method reasonably reflects the costs. Such regulations shall (i) take into account both direct and indirect costs of providers of services (excluding therefrom any such costs, including standby costs, which are determined in accordance with regulations to be unnecessary in the efficient delivery of services covered by the insurance programs established under this subchapter) in order that, under the methods of determining costs, the necessary costs of efficiently delivering covered services to individuals covered by the insurance programs established by this subchapter will not be borne by individuals not so covered, and the costs

with respect to individuals not so covered will not be borne by such insurance programs, and (ii) provide for the making of suitable retroactive corrective adjustments where, for a provider of services for any fiscal period, the aggregate reimbursement produced by the methods of determining costs proves to be either inadequate or excessive.