## HOSPITAL AFFILIATES INTERNATIONAL, INC.

### v.

### Richard SCHWEIKER, in his official capacity as Secretary of Health & Human Services.

### No. CIV-1-81-107.

United States District Court, E. D. Tennessee, S. D.

July 30, 1982.

Thomas, Mann & Gossett, Chattanooga, Tenn., for plaintiff.

W. Thomas Dillard, U. S. Atty., Chattanooga, Tenn., for defendant.

## MEMORANDUM

FRANK W. WILSON, Chief Judge.

This is an action under the Medicare Act, 42 U.S.C. §§ 1395 *et seq.* (1976) as amended. The plaintiff alleges that it suffered a capital loss when it sold a capital asset to Downtown Hospital Association (DHA) in 1975 (¶ 11, Court File # 1). It is alleged that this loss was the result of the failure of Hospital Affiliates International (HAI) adequately to depreciate the building and equipment sold to DHA. HAI now seeks reimbursement for part of this loss under 42 CFR § 405.415. The case is presently before the Court upon plaintiff's motion for summary judgment, and the defendant's motion for affirmance of the decision of the Secretary.

### A—*The Medicare Program*

The Health Insurance for the Aged Act, commonly known as "Medicare", created a system whereby certain aged and disabled persons could receive necessary medical care at little or no cost to themselves. The participating hospital, or provider, is reimbursed by the Government for the reasonable or customary cost of providing these services. This includes the cost to the provider of depreciation of capital assets. The reimbursement, and the determination of the amount to be reimbursed, is commonly done by a fiscal intermediary, 42 U.S.C. § 1395h, here Blue Cross/Blue Shield of Tennessee.

In order to insure that providers are not deprived of needed operating capital, the Act provides for intermittent estimated payments to the provider. 42 U.S.C. §§ 1395g, 1395x(v)(1)(A)(ii); 42 CFR §§ 405(b)(1), (2), 405.454. These are usually made monthly. At the end of its fiscal year, the provider submits a final cost report to the intermediary, 42 CFR § 405.-406(b), which then either reimburses the provider for amounts not previously paid, or recovers amounts overpaid to the provider, 42 CFR § 405.1803.

### B—*Facts*

#### 1. *Background*

Newell Hospital was originally built soon after the turn of the century in downtown Chattanooga, Tennessee, by Dr. Edwin Newell, Sr., and a Dr. Dunbar. Dr. Newell, Jr., the son of the founder, sold the hospital to Healthcare, Inc., in the 1960's. The facility was then acquired by the plaintiff, HAI, when it merged with Healthcare in 1971.

In 1974 HAI determined that due to the physical deterioration of the hospital building, it was faced with either closing the hospital altogether, or building a new facility. HAI's first choice was to attempt to build a new structure. HAI applied for and received a Certificate of Need for the construction from the Tennessee Health Facilities Commission. HAI also retained an architectural firm to plan the new building. The initial cost estimate was $3,500,000.00.

Soon thereafter HAI management determined that the company lacked capital resources sufficient to finance the construction. HAI then conceived the notion of transferring the hospital to a local non-profit corporation while continuing to manage the hospital through a contract with the non-profit corporation.

Local business and professional leaders were approached by Dr. Newell, then on the board of HAI, with the idea of forming the non-profit corporation to own the hospital. This resulted in the incorporation of Downtown Hospital Association (DHA) on January 23, 1975. The original incorporators were Jac Chambliss, a local attorney, Dr. Robert Mabe, a staff physician at Newell, William Brown, Vice President and General

Counsel to the American National Bank, and Richard Moore, General Manager of Loveman's, Inc. Prior to this incorporation, the incorporators met with Dr. Newell and Mr. Joseph DeCosimo, Chairman of the Health & Educational Facilities Board of Chattanooga (HEFB). The purpose of these meetings was to attempt to work out a way that the HEFB could acquire the old Newell Hospital from HAI, issue bonds to finance the construction of a new hospital on the site, and lease the hospital to DHA on a longterm basis.

These discussions resulted in an "inducement contract" among HEFB, HAI, and HEFB's financial adviser, J. C. Bradford & Co., executed on March 14, 1975. The terms of this contract provided that HAI would, *inter alia* : (1) construct and equip a new hospital; (2) lease the underlying real property to the HEFB; and (3) "cause the lessee to enter into a lease with the Board." (R. 0963) The lessee referred to here is DHA, even though it was not a party to the contract. The HEFB agreed: (1) to lease the land from HAI; (2) to issue some $4,200,000.00 in bonds to finance construction of a new hospital; and (3) to lease the land and building to the lessee (again, DHA). HAI also agreed to manage the hospital pursuant to an envisioned contract between HAI and the lessee. When DHA became actively involved in the preliminary negotiations, a new inducement contract was drawn, naming DHA as a party, containing substantially the same terms as the first inducement contract. This second contract was never executed, and there is evidence in the record that the parties abandoned the first inducement contract as superfluous when negotiations began to proceed apace.

The first meeting of the board of directors of DHA took place on April 3, 1975. Representatives of HEFB presented a draft management contract to the board. The management company was to be Hospital Management Corporation, a wholly owned subsidiary of HAI. The board did not accept the contract at this meeting, but did accept it, after what was called "lively" discussion at its next meeting on April 11, 1975. The board did not solicit bids from other management companies. Instead, it examined the brochures of at least one, and perhaps two others. Before agreeing with Hospital Management, the board obtained concessions concerning renegotiability of the management fee, a loan of approximately $200,000.00 as up-front operating capital from HAI, and a reduction in amount and a change in terms of HAI's fee for supervising construction of the new hospital. The duration of the contract was to be 30 years, a term insisted upon by the bond underwriters, with termination of the contract by either party only for cause.

The negotiations culminated with the closing on August 14, 1975. Various instruments were executed by the parties, which resulted in the following: (1) HEFB issued $3,450,000 in revenue bonds to finance construction of the new hospital facility; (2) DHA and Hospital Management entered into the management contract; (3) HAI leased the land, building, and equipment to HEFB, and also gave the deed of trust to HEFB to secure payment of the bonds; and (4) HEFB leased the land, the proposed new building and equipment to DHA. The result of all this was that HAI owned the underlying fee in the land and was to manage the hospital; HEFB leased the land from HAI and owned the new hospital; DHA leased both the land and the building from HEFB. HAI agreed to subordinate its management fee and the lease payment to the obligation on the bonds, another concession insisted upon by the underwriters.

There is substantial evidence of arms-length bargaining among the parties to these transactions. The best evidence of this are the various concessions made by HAI. The lease payments on the land and equipment were lowered from 15% of appraised value to 11% on the building, or 12% of book value; the fee for supervising the construction was lowered from $200,000.00 to $180,000.00 with no upfront cash; the management fee was made subject to renegotiation at a future date, contingent upon the hospital's increase in size; and, HAI agreed to subordinate its fees and lease payments to the liability on the bonds.

The hospital has operated since its opening on August 23, 1976, under the control of its board of directors. The hospital's administrator and comptroller are employees of HAI, under the terms of the management contract. An internal operating committee was formed as an intermediary between the hospital's staff and the board. The administrator is a member of this committee, but does not have a right to vote. None of the directors of DHA has now, nor apparently has ever had, any financial interest in HAI; none was an employee of HAI, or sat on HAI's board of directors.

## 2. *The Loss to HAI*

As was mentioned above, HAI acquired Newell Hospital when it merged with Healthcare, Inc., in 1971. Healthcare's basis in the hospital, and therefore HAI's basis, is the historical cost of the asset less accumulated depreciation. The historical cost to HAI of the building was $388,082.00, and of the equipment, $384,585.75, thus making a total historical cost of $772,667.75. HAI depreciated the hospital and equipment by $340,158.00, leaving an adjusted basis of $432,509.75. HAI has recovered the reimbursable portion of this depreciation in earlier years. HAI sold the hospital for $150,006.75, making for a loss of $282,503.00. HAI claims that this loss is attributable to its failure to depreciate the assets at as rapid a rate as they actually declined in value, with the unreimbursed depreciation reimbursable under 42 CFR § 405.415. The reimbursable portion of this loss comes to $116,529.00, which is the amount in controversy here. These figures are not a matter in dispute at this point, the question being whether HAI is entitled to reimbursement at all.

## C—*Jurisdiction*

HAI's claim for reimbursement was rejected by its fiscal intermediary, Blue Cross/Blue Shield of Tennessee. HAI appealed this denial to the Provider Reimbursement Review Board (PRRB), 42 U.S.C. § 1395*oo*(a). The PRRB took jurisdiction of the case and affirmed the denial of reimbursement on January 23, 1981. The Secretary declined to review on his own motion the PRRB's decision, and thus it became final administrative action for purposes of judicial review, 42 U.S.C. § 1395*oo*(f), 5 U.S.C. § 704, and HAI timely filed this action to review the decision of the PRRB.

## D—*The Issues and the Standard of Review*

The issues presented to the PRRB were: (1) whether HAI and DHA were related parties within the meaning of 42 CFR § 405.427; and (2) if the parties were related, whether the regulations prohibit reimbursement. The PRRB expressly found the parties to be related, and implicitly found that the regulations prohibited reimbursement because the parties were related. Thus, the issues before this Court are the same as those before the PRRB. In addition, the plaintiff has raised before this Court two other issues: (3) whether the decision of the PRRB satisfied the provisions of the Administrative Procedure Act; and (4) whether during the hearing before the PRRB the plaintiff was denied its right of cross-examination.

■ Our review of the action of the PRRB is somewhat limited. The Medicare Act, for the purpose of judicial review of agency decisions, incorporates the provisions of the Administrative Procedure Act (APA). 42 U.S.C. § 1395*oo*(f)(1) incorporating 5 U.S.C. §§ 701–706. The APA provides the following standard for the scope of review:

"To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. The reviewing court shall—

     \*      \*      \*      \*      \*      \*

"(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

"(A) arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law;

     \*      \*      \*      \*      \*      \*

"(E) unsupported by substantial evidence in a case ... reviewed on the record of an agency hearing provided by statute."

5 U.S.C. § 706; *see also Columbus Community Hospital, Inc. v. Califano*, 614 F.2d 181, 185 (8th Cir. 1980). As was said by the Fourth Circuit, "We are empowered to determine only if the Secretary's findings and conclusions are supported by substantial evidence and are not arbitrary, capricious, or otherwise contrary to law." *Richlands Medical Association v. Harris*, 651 F.2d 931, 934 (4th Cir. 1981). In the opinion of this Court, the decision of the PRRB that HAI and DHA were related is a factual determination made on the record presented to the Board, and therefore we must proceed as to this issue under the substantial evidence test of 5 U.S.C. § 706(2)(E). "Substantial evidence" means "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). Under this standard, "[A] reviewing court may not substitute its judgment for that of the agency." *Memorial, Inc. v. Harris*, 655 F.2d 905, 912 (9th Cir. 1980). On the other hand, the Court must review, searchingly and carefully, the record as a whole, *id.* and it

"[M]ay not affirm the Board's decision based on any post hoc rationalizations advanced by government counsel. The Court must look solely at the Decision of the Board which itself has to 'be supported by substantial evidence when the record is viewed as a whole.'"

*Doctors' Hospital, Inc. v. Califano*, 459 F.Supp. 201, 205 (D.D.C.1978) (*quoting* 42 U.S.C. § 1395*oo* (d)).

"Substantial evidence" means more than a scintilla, *United States ex rel. Checkman v. Laird*, 469 F.2d 773 (2nd Cir. 1972), but less than a preponderance. *Daniel v. Gardner*, 404 F.2d 889 (4th Cir. 1968). Some courts have articulated the standard to be that there is substantial evidence if, were the trial to the jury, the judge would refuse to direct a verdict against the party opposing the motion. *Missouri-Kansas-Texas Railroad Co. v. United States*, 632 F.2d 392

(5th Cir. 1980), *cert. den.*, 451 U.S. 1017, 101 S.Ct. 3004, 69 L.Ed.2d 388 (1981). Under this standard, the evidence is to be construed more strongly in favor of the party against whom the motion is made (here the Secretary), and the Secretary should receive the benefit of every legitimate inference. 9 C. Wright & A. Miller, *Federal Practice and Procedure* § 2528 at 564. The standard for deciding whether to direct a verdict is:

"[W]hether the evidence is such that, without weighing the credibility of the witnesses or otherwise considering the weight of the evidence, there can be but one conclusion as to the verdict that reasonable men could have reached."

*Simblest v. Maynard*, 427 F.2d 1, 4 (2nd Cir. 1970); *see also Morelock v. NCR Corp.*, 586 F.2d 1096, 1105 (6th Cir. 1978), *cert. den.*, 441 U.S. 906, 99 S.Ct. 1995, 60 L.Ed.2d 375 (1979).

The other issues raised by the plaintiff are strictly legal in nature, and thus this Court may review them in a plenary manner. Even though the decisions of an agency interpreting its own regulations are entitled to deference by this Court, *see, e.g., Donner Hanna Coke Corp. v. Costle*, 464 F.Supp. 1295, 1304 (W.D.N.Y.1979); *Northwest Community Hospital, Inc. v. Califano*, 442 F.Supp. 949, 951 (S.D.Iowa 1977), "the Secretary has no special expertise in addressing legal questions," *Medical Center of Independence v. Harris*, 628 F.2d 1113, 1117 (8th Cir. 1980), and it is the duty of the reviewing court to correct the PRRB's misapplication of the law, if the Court perceives the PRRB to be in error. *Memorial, Inc. v. Harris*, 655 F.2d 905, 910 (9th Cir. 1980).

### E—*The PRRB's Decision*

The decision of the PRRB is contained at pages 8 thru 11 of a very lengthy administrative record. The PRRB, after reviewing the facts, stated:

"The Board notes that by virtue of the agreement between the parties HAI owned and managed Newell Hospital before the sale and, after the sale, HAI continued to manage the Facility, now

known as Downtown Hospital Association.... In the case at hand, HAI not only had the ability to exercise control over DHA, but in fact did exercise control by virtue of the management contract between the parties. Thus, the Board must find that HAI and DHA were related organizations, and the loss on the sale of Newell Hospital is not allowable."

R.0011. This is the language against which the record must be evaluated in order to determine whether there is substantial evidence to support the PRRB's decision.

### F—Discussion

#### 1. Related Parties

The regulations provide that costs applicable to transactions between related parties are allowable to provider only to the extent of the cost to the related party. 42 CFR § 405.427. The first issue, simply stated, is then whether HAI and DHA were, at the time of the sale, related parties within the meaning of Section 405.427. (At the time of this transaction this section was in Title 20 of the *Code of Federal Regulations.* Since the language is identical, the current version will be cited). This regulation states:

"(b) *Definitions.*—(1) *Related to provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.
"(2) *Common ownership.* Common ownership exists when an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.
"(3) *Control.* Control exists where an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution."

42 CFR § 405.427(b)(1), (2) and (3) (1980). Further explication of what control means may be found in the Provider Reimbursement Manual. "The term 'control' includes any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised. It is the reality of the control which is decisive, not its form or the mode of its exercise." Prov.Reimb.Man., Part I, § 1004.3. The Secretary does not contend here that the parties were related by common ownership; instead he argues that there was common control. It is clear that such control need not be exercised; it is simply the "power" to control that is necessary. *Medical Center of Independence v. Harris, supra,* 628 F.2d at 1118.

The cases are instructive with regard to what has been considered substantial evidence in situations where the parties were alleged to be related. A management contract similar to the one involved here was held by the court to be insufficient to support the Secretary's finding that the parties were related in *Northwest Community Hospital, Inc. v. Califano,* 442 F.Supp. 949 (S.D. Iowa 1977). In that case, there was no relationship at all between the parties prior to the execution of the management contract. The hospital was in financial trouble and had been forced into bankruptcy. Its receiver solicited bids from various management companies and eventually, with the court's approval, selected Hospital Management Corporation. *Id.* at 950. The court held that the management contract, standing alone, was not sufficient to establish that the parties were related, stating:

"[T]he relationship between the parties must be determined by the circumstances existing at the time the management contract was executed, not according to the rights created under the contract." *Id.* at 951.

This case does not present precisely the same factual situation as does the case at bar, however, because there were substantial contacts between the HAI and the DHA before the management contract was executed.

The court's reasoning in *Northwest Community Hospital* is somewhat weakened by the statement in *Medical Center of Independence v. Harris,* 628 F.2d 1113 (8th Cir. 1980), that the power to control after the contract is executed is influential. *Id.* at

1119. This factor was not dispositive of the case, however, because six employees of the management company were directors of the provider, and two were officers. The court found the ability to control in this case to flow primarily from this fact. *Id.* at 1118; *see also Bolivar Community Hospital v. Blue Cross Association/Blue Cross of Tennessee*, [1980 Transfer Binder] Medicare & Medicade Guide (CCH) ¶ 30,647. In the present case, HAI was clearly not as intertwined with DHA as were the parties in *Medical Center.*

The parties were found to be related in *American Hospital Management Corp. v. Harris*, 638 F.2d 1208 (9th Cir. 1981). That case involved a sale and lease back between American Hospital Management and Cal Med. Cal Med was a limited partnership of AHMC shareholders, and the sole general partner was the president of AHMC. The court held that the parties were related. The case is not particularly useful here, however, because the court found relationship by control and by ownership. *Id.* at 1211. In addition, AHMC's involvement with Cal Med was substantially greater than HAI's involvement with DHA in the present case.

*Richlands Medical Association v. Harris*, 651 F.2d 931 (4th Cir. 1981) is not so easily distinguishable. A family owned a hospital which it leased to a professional association composed solely of doctors. The administrator, a member of the owning family and therefore a lessor, proposed substantial rent increases, which were approved by the association. The court upheld the denial of reimbursement for the rent on three grounds: first, the longstanding relationship between the parties (approximately 14 years); second, the lease instrument vested the hospital's accounts receivable in the lessor upon termination of the lease; and third, it was the lessor/administrator who requested the rent increases. *Id.* at 934. The court held, "[T]he lessor had the power significantly to influence the Association's decision to increase the rent." *Id.* While the facts in the case at bar differ, there are analogous factors, which make this case substantially similar to *Richlands*. The re-lationship is certainly not of as longstanding as in *Richlands*, but clearly HAI through Dr. Newell was instrumental in bringing about the existence of DHA, and the management contract which ensued certainly provides for a longstanding relationship. The lease apparently does not vest the hospital's accounts receivable in HAI upon termination of the contract, but HAI assigned its accounts receivable to DHA in the form of a loan in order to give DHA operating capital, as DHA had no assets at all. In addition, DHA's administrator is an employee of HAI, as is DHA's comptroller. While these factors are distinguishable from those in *Richlands*, in the opinion of the Court they are legally insignificant distinctions.

The facts in *Jackson Park Hospital Foundation v. United States*, 659 F.2d 132 (Ct.Cl. 1981) were held sufficient to establish that the parties were related. In *Jackson Park* seven of twelve directors of the foundation were owners of 83% of Hospital, Inc., from whom the foundation bought the hospital. In addition, the president of the board of the foundation owned 80% of Hospital, Inc.'s stock of another class. *Id.* at 134. Similarly, in *Goleta Valley Community Hospital v. Schweiker*, 647 F.2d 894 (9th Cir. 1981), the provider was denied reimbursement for depreciation and rent because when the hospital bought the facility from San Marcos Associates, the hospital's board consisted solely of seven San Marcos' partners. *Id.* at 896. On this basis, they were found to be related. *Id.* at 897. A similar case is *Fallston General Hospital v. Harris*, 481 F.Supp. 1066 (D.Md.1979) where the provider was a limited partnership whose only general partner was Fallston Medical Complex Operating Corporation (FMCOC). FMCOC was wholly owned by a Dr. Bonovich and three others. The hospital leased the building from Fallston Medical Complex general partnership, which was 95% owned by Drs. Bonovich et al. The court found the parties to be related and denied reimbursement for rental payment. *Id.* at 1068–69. *See also Stevens Park Osteopathic Hospital, Inc. v. United States*, 633 F.2d

1373 (Ct.Cl.1980) (a Dr. X owned 75% of the proprietary corporation, sat on the hospital's board and was chairman of its executive committee); *Hillside Community Hospital of Ukiah v. Mathews*, 423 F.Supp. 1168 (N.D.Cal.1976) (Hillside Community Hospital bought the hospital from Hillside Associates, and three directors of the buyer owned 46.5% of the seller); *accord Fairfax Hospital Ass'n v. Mathews*, 459 F.Supp. 429 (E.D. Va.1977), *aff'd sub nom Fairfax Hospital Ass'n v. Califano*, 585 F.2d 602 (4th Cir. 1978); *South Boston General Hospital v. Blue Cross of Virginia*, 409 F.Supp. 1380 (W.D.Va.1976).

These cases are each distinguishable to a greater or lesser degree from the case before the Court. The Court is of the opinion, however, that the evidence of control, compared to that in the cases cited above, is not so lacking as to be insubstantial. That is, the Court finds that the decision of the PRRB as to the relationship between HAI and DHA is supported by substantial evidence. Among the factors from which the PRRB could properly have reached its conclusion are: (1) the idea to form a non-profit corporation to own the hospital originated with HAI; (2) HAI intended to manage the hospital all along, and without the management contract none of the rest of the transaction would likely have occurred; (3) HAI laid all the preliminary groundwork, and then, in a manner of speaking, created a buyer; (4) an HAI employee convened the first board meeting of DHA; (5) the management contract gave HAI broad powers and was for a long duration; (6) HAI loaned DHA $200,000.00 on which to begin operations as DHA had no assets of its own at all; (7) HAI still owned the underlying fee simple in the real estate; (8) the board of DHA solicited no other bids for the management contract; (9) the contract was approved with only minor changes eight days after it was presented to the DHA board; and (10) each party to the contract could terminate unilaterally only for cause.

While the Court, if hearing this case *de novo*, might reach a result contrary to the one reached by the PRRB, the Court may not substitute its judgment for that of the PRRB. There is evidence sufficient, if the case were being tried by a jury, to refuse to direct a verdict against the Secretary. Therefore, we must hold that the decision of the PRRB that DHA and HAI were related parties within the meaning of Section 405.427 is supported by substantial evidence and must be affirmed. The motion for summary judgment on this issue by the plaintiff is denied, and a motion to affirm by the Secretary is, on this issue, granted.

## 2. *Applicability of the Regulations*

The plaintiff argues that even if this Court finds, as it has done, DHA and HAI to be related parties, the regulations do not prohibit reimbursement to HAI under these circumstances. The plaintiff finds support for this argument in the words of the regulations. Section 405.427 refers to "[c]osts applicable to ... facilities ... furnished to the provider" by a related organization. HAI insists that the regulation is inapplicable because it (as a provider) was not furnished facilities, but instead furnished facilities to another provider (DHA), a situation not contemplated by the regulation. In addition, the plaintiff argues that Section 405.415, regarding reimbursement for depreciation, does not prohibit reimbursement here. That section, so the argument goes, relates only to the basis to be taken by a purchaser, and HAI is here a seller.

The Secretary admits in his briefs that the regulations are not as clear on this point as they might be. The Court agrees with the plaintiff that Section 405.415 and Section 405.427 do not, by their literal terms, prohibit reimbursement to HAI under these facts. This conclusion does not, however, end the inquiry.

■■■ Reimbursement for depreciation is governed by 42 CFR § 405.415, which states in part:

"(a) *Principal.*—An appropriate allowance for depreciation on buildings and equipment used in the provision of patient care is an allowable cost.

> \* \* \* \* \* \*

"(f) *Gains and Losses on Disposal of Assets.*—

"(1) *General.* Depreciable assets may be disposed of through sale, scrapping, trade-in, exchange, demolition, abandonment, condemnation, fire, theft, or other casualty. If disposal of the depreciable assets results in a gain or loss, an adjustment is necessary in the provider's allowable costs.

\* \* \* \* \* \*

"(2) *Bona Fide Sale or Scrapping.*

"(i) Except as specified in paragraph (f)(3) of this section, gains and losses realised from the bona fide sale or scrapping of depreciable assets are allowable costs. . . ."

The present sale involves a sale of assets, as so agreed by the parties. Therefore, if the transaction fits within the regulation, HAI may be reimbursed. Section 405.415(f)(2) refers only to *bona fide* sales. A transaction between related parties cannot be *bona fide. Northwest Hospital, Inc. v. Hospital Service Corp.,* 500 F.Supp. 1294, 1297 (N.D. Ill.1980); *South Boston General Hospital v. Blue Cross of Virginia,* 409 F.Supp. 1380 (W.D.Va.1976). Even if the concept of a *bona fide* transaction were to be dealt with on a case by case basis, *Richlands Medical Association v. Harris,* 651 F.2d 931 (4th Cir. 1980), the present case could not be found to involve a *bona fide* transaction on this record. There is no evidence in the record that the purchase price bore any relation to the actual value of the property. Without such evidence, no determination of the transaction's being *bona fide* is appropriate. Therefore, the Court is of the opinion that HAI is not entitled to reimbursement. In further support of this conclusion, the regulations read together evidence a policy of non-reimbursement for gains or losses resulting from transactions between related parties. 42 CFR §§ 405.415(d)(3)(ii) and 405.427. This is consistent with the statute's limitation of costs reimbursable to providers.

"The reasonable cost of any services shall be the cost actually incurred, excluding therefrom any part of incurred cost found to be unnecessary in the efficient delivery of needed health service. . . ."

42 U.S.C. § 1395x(v)(1)(A); *see also Good Luck Nursing Home, Inc. v. Harris,* 636 F.2d 572, 578 (D.C.Cir.1980), *American Medical International, Inc. v. Secretary of HEW,* 466 F.Supp. 605, 612 (D.D.C.1979). The statute, regulations and cases all exhibit a strong antipathy toward reimbursement for costs not necessary to the efficient delivery of medical care to the needy. Inherent in this antipathy is a realization that gains or losses from related party transactions are not necessary costs. As an example, the result sought by the plaintiff would allow an owner of a hospital, whenever it has wrongly estimated the facility's useful life or salvage value, to sell the asset to a controlled buyer, recover for its miscalculation from the Medicare Program, and in substance retain the asset. Neither Congress nor the Secretary may reasonably be assumed to have approved such a result. The fact that there may be a gap in the regulations does not prevent this Court from reaching its conclusion. "In statutory interpretation, the courts must often, in effect, consider what answer the legislature would have made as to a problem that was neither discussed nor contemplated." *Portland Cement Association v. Ruckelshaus,* 486 F.2d 375, 380 (D.C.Cir.1973), *cert. den.,* 417 U.S. 921, 94 S.Ct. 2628, 41 L.Ed.2d 226 (1974).

Finally, this Court is loathe to find contrary to law the Secretary's interpretation of his own regulation. Traditionally, such an interpretation is entitled to judicial deference, and the Court sees no reason now to depart from this principle. *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 86 S.Ct. 1018, 16 L.Ed.2d 131 (1966); *Udall v. Tallman,* 380 U.S. 1, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965); *Pacific Coast Medical Enterprises v. Harris,* 633 F.2d 123 (9th Cir. 1980).

Therefore, HAI and DHA are related parties, and the statute and regulations prohibit reimbursement to HAI for the unrecovered depreciation occasioned by the sale to DHA.

3. *Adequacy of the PRRB Decision*

■ The plaintiff raises the additional contention that this Court should reverse

the decision of the PRRB and remand the case to that body because of allegedly inadequate findings of fact and conclusions of law (Brief of Plaintiff at 37–41). The plaintiff relies upon Section 557(c)(A) and (B) of the Federal Administrative Procedure Act, 5 U.S.C. § 557(c)(A) and (B), which provides:

> "The record shall show the ruling on each finding, conclusion, or exception presented. All decisions, including initial, recommended, and tentative decisions, are a part of the record and shall include a statement of—
>
> "(A) findings and conclusions, and the reasons or basis therefor, on all the material issues of fact, law or discretion presented on the record; and
>
> "(B) the appropriate rule, order, sanction, relief, or denial thereof."

On the other hand, the Government argues that this portion of APA has no application in a case such as the present one (Brief of Defendant at 25 n. 12), because Congress provided a specific procedure for PRRB hearings and decisions in 42 U.S.C. § 1395*oo*.

It is unnecessary for the Court to decide whether proceedings before the PRRB, and its decisions, are governed by the APA, or by Section 1395*oo* alone, because the decision in this case satisfies either statute. The PRRB made sufficient findings of fact in its "summary of facts" (R.0009–0010), and sufficient conclusions in its "conclusions and findings" section (R.0010–0011). The decision record is entirely adequate to allow this Court to determine the bases upon which the decision was made. The fact that one issue was not expressly decided, but was clearly decided by implication, is of no importance. The decision of the PRRB satisfies the standard set forth in *Burlington Truck Lines v. United States*, 371 U.S. 156, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962):

> "[The administrative agency] must 'disclose the basis of its order' and 'give clear indication that it has exercised the discretion with which Congress has empowered it.' [citation omitted] The agency must make findings that support its decision,

and those findings must be supported by substantial evidence."

*Id.* at 168, 83 S.Ct. at 245, 9 L.Ed.2d at 215–16; *see also Greater Boston Television Corp. v. FTC*, 444 F.2d 841 (D.C.Cir.1970). In conclusion, the Court finds that the PRRB decision is not inadequate, and therefore this case need not be remanded on that basis.

4. *Right to Cross Examine Witnesses*

■ Finally, the plaintiff argues that the PRRB committed prejudicial error in allowing David Deal, an employee of the fiscal intermediary, Blue Cross/Blue Shield of Tennessee, to testify about his opinion as to the relative length of the management contract in issue here. (Brief of Plaintiff at 41–44) Plaintiff contends that it should have been given access to the other contracts relied upon by Mr. Deal in reaching his conclusion. The chairman of the PRRB was careful to limit Mr. Deal's testimony to a general opinion, without reference to specific contracts. (R. 0246–0248)

As contended by the plaintiff, even though the *Rules of Evidence* are not applicable, the fundamental rules of due process apply to an administrative action, *Greene v. McElroy*, 360 U.S. 474, 79 S.Ct. 1400, 3 L.Ed.2d 1377 (1963); *Reilly v. Pinkus*, 338 U.S. 269, 70 S.Ct. 110, 94 L.Ed. 63 (1949), and these include the right of cross examination. *Wirtz v. Baldor Electric Co.*, 337 F.2d 518, 526 (D.C.Cir.1963). But, as the United States Supreme Court has stated:

> "[D]ue process deals with matters of substance and is not to be trivialized by formal objections that have no substantial bearing on the ultimate rights of the parties."

*Market Street Railway Co. v. Railroad Commission*, 324 U.S. 548, 562, 65 S.Ct. 770, 777, 89 L.Ed. 117, 118 (1945).

In the Court's view, plaintiff was not denied the right to cross examine Mr. Deal. As stated above, the testimony was carefully delimited by the board chairman, and plaintiff had every opportunity to cross examine Mr. Deal as to the basis of his opinion. It is doubtful that had the plaintiff been given access to the specific contracts,

even if they could have been identified, that they would have been of any assistance to the plaintiff in cross examining Mr. Deal. The procedure used by the PRRB here fully comports with F.R.Evid. 705, even though the rules need not be followed in hearings before the PRRB. Thus, the Board went to greater lengths to accommodate the plaintiff than it had need to do.

### G—*Conclusion*

For the foregoing reasons, the Court is of the opinion that the plaintiff's motion for summary judgment should be denied, and that the defendant's motion to affirm the decision of the Secretary should be granted.

An appropriate order will enter.