**BILOXI REGIONAL MEDICAL CENTER, Appellant,**

v.

**Otis R. BOWEN, Secretary, Dept. of H.H.S.**

No. 86–5615.

United States Court of Appeals, District of Columbia Circuit.

Argued Oct. 2, 1987.

Decided Dec. 18, 1987.

Ronald N. Sutter, Washington, D.C., for appellant.

Thomas K. Stuber, Atty., Dept. of Health and Human Services, with whom Richard K. Willard, Asst. Atty. Gen., Dept. of Justice and Joseph E. diGenova, U.S. Atty., Washington, D.C., were on the brief, for appellee.

Before EDWARDS, STARR and D.H. GINSBURG, Circuit Judges.

Opinion for the Court filed by Circuit Judge D.H. GINSBURG.

D.H. GINSBURG, Circuit Judge:

This case arises under the Medicare reimbursement provisions of Title XVIII of the Social Security Act ("the Act"), 42 U.S.C. § 1395 *et seq.* (1982), and implementing regulations promulgated by the Secretary of Health and Human Services ("the Secretary"). Under the Act and regulations, hospitals and other health care facilities that provide covered health care services to Medicare beneficiaries are ordinarily reimbursed for the actual reasonable costs they incur in delivering those services. 42 U.S. C. § 1395f(b) (1982).[1] The appellant, Biloxi Regional Medical Center ("the Center"), rents hospital facilities owned and originally equipped by the City of Biloxi, Mississippi. During its 1982 cost reporting year, the Center's rental payments to the City totaled $800,000. When the Center claimed a portion of these payments as a reasonable cost attributable to its care of Medicare beneficiaries, however, the Center's fiscal intermediary[2] denied reimbursement for the payments.

The Center appealed to the Provider Reimbursement Review Board ("PRRB"),[3] which affirmed the decision of the intermediary.[4] The PRRB, like the intermediary, determined that the Center and the City of Biloxi were "organizations related ... by common ownership or control," *i.e.*, that the City controlled the Center. Under regulations promulgated by the Secretary, a provider of covered health services that is furnished services, facilities, or supplies by such a "related organization" is reimbursed

1. For cost reporting years after 1983, the reimbursement system established by the "reasonable costs" statute and regulations has been replaced, with a few exceptions, by a prospective payment system. For a discussion of the 1983 amendments to the Social Security Act, see *Washington Hosp. Center v. Bowen,* 795 F.2d 139, 141–42 (D.C.Cir.1986).

2. The Act authorizes the Secretary to enter into agreements with public or private agencies or organizations nominated by providers to serve as their fiscal intermediaries. The nominated agency or organization assumes responsibility for determining the proper amount of reimbursement to which particular providers are entitled and makes payments directly to the providers in accordance with that determination. 42 U.S.C. § 1395h (1982).

3. The PRRB is an administrative body established by the Secretary. Is is composed of five members, all of whom must be "knowledgeable in the field of payment to providers of services." Two members of the PRRB must be representatives of providers, and a third must be a certified public accountant. 42 U.S.C. § 1395*oo* (1982).

4. *Biloxi Regional Medical Center,* No. 84–652 (Provider Reimbursement Review Board, Oct. 18, 1985).

for the costs incurred by the related, supplying organization, but only to the extent that such "cost[s do] not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere." 42 C.F.R. § 405.427(a) (1982).[5] Maintaining that the PRRB improperly applied the related organizations regulation, the Center filed a civil action against the Secretary in the District Court,[6] which granted summary judgment in favor of the defendant.[7] The Center appealed and, for the reasons set forth below, we reverse.

## I

The Center is a not-for-profit corporation chartered in the State of Mississippi in 1981. By the terms of an agreement dated May 29, 1981, the Center assumed the operation of a hospital formerly known as Howard Memorial Hospital. Signatories to this agreement included the Center, the City, and three other parties: New Biloxi Hospital ("NBH"), which had operated Howard Memorial Hospital since 1963 under a lease from the City; Methodist Hospitals of Memphis, Tennessee ("Methodist"), a corporation that operates health care facilities; and American Medical Management Hospital Group, Inc. ("AMM"), a subsidiary of Methodist. The 1963 lease had provided NBH with a rent-free term of twenty-five years, with an option to renew the lease for an additional twenty-five years.[8] Under the 1981 agreement, NBH assigned the lease, with certain revisions, to the Center. Methodist agreed to affiliate with the Center and to lend its cooperation and expertise in establishing the facility as a regional medical center. The agreement recognized AMM as the Center's intended management group and guarantor of the Center's financial responsibilities under the agreement.[9]

In assuming NBH's obligations, the Center agreed to operate Howard Memorial Hospital under the name Biloxi Regional Medical Center, but also promised "to begin as soon as practical and possible plans for the construction of new facilities." J.E. at 275. If the Center did not substantially complete the new facilities by July 1, 1985, the City reserved the right to cancel the agreement and take over operation of the hospital.

For purposes of this case, the most significant revision of the 1963 lease between the City and NBH concerns the Center's agreement to make monthly rental payments to the City in "an amount determined after an independent rental appraisal has been completed by a qualified appraisal firm." *Id.* at 279. After the agreement was signed, an appraisal firm determined

**5.** The Secretary's reasonable costs regulations, including the "related organizations" regulations, have been redesignated as Part 413 of Title 42. *See* 51 Fed.Reg. 34790 (1986). Following the practice of the parties, we will refer to the original related organizations regulations. The redesignated regulations are substantively identical to the original regulations.

**6.** "The PRRB's decision constitutes final agency action unless the Secretary, acting through the Administrator or Deputy Administrator of the Health Care Financing Administration ... modifies or reverses the PRRB's determination. [citation omitted] This final decision is then subject to judicial review pursuant to 42 U.S.C. 1395*oo*(f)(1) (1982)." *Humana, Inc. v. Heckler,* 758 F.2d 696, 698 n. 9 (D.C.Cir.1985).

**7.** *Biloxi Regional Medical Center v. Bowen,* C.A. No. 86-0043, mem. op. (D.D.C. Sept. 11, 1986).

**8.** When NBH was operating the hospital, its intermediary regarded NBH and the City as related organizations for purposes of Medicare

reimbursement. Thus, even though NBH paid no actual rent, it was reimbursed for an allocable portion of the City's cost of owning the hospital. *See* Brief for Appellees at 7.

**9.** The Center agreed to place $400,000 into an account for current working capital. It also agreed to satisfy NBH's outstanding obligations and to make current all the hospital's accounts payable. Additionally, the Center agreed to assume NBH's obligation to pay off the City's bonded indebtedness relating to Howard Memorial Hospital in accordance with the then-existing payment schedule. This indebtedness approximated $500,000. The Center also agreed to make available and to use no less than $1,500,000 for new equipment and to expend no less than $1,100,000 for structural repairs and improvements to the facility. Finally, the Center and AMM agreed to provide an initial performance bond of $5,500,000 and additional annual performance bonds or letters of credit in the amount of $100,000 for each year ending after March 1, 1987. *See* Joint Excerpts from the Administrative Record ("J.E.") at 278-79, 282.

that the annual fair market rental value of the facility was $800,000. The Center paid this amount to the City during its 1982 cost reporting year; in its 1982 cost report to its fiscal intermediary, Blue Cross and Blue Shield of Mississippi ("Blue Cross"), the Center claimed slightly more than $450,000 of these payments as a reasonable and reimbursable cost allocable to Medicare.

Blue Cross denied the Center's claim on the ground that the Center and the City were related organizations within the meaning of the Secretary's regulations. In reaching this conclusion, Blue Cross relied upon an opinion issued from the Secretary's Regional Office concluding that although "the City [was] not involved in the day to day operations of the Center," the City and the Center were related by common control. Id. at 264.[10] As a result of this finding, the Center was reimbursed only about $93,000, representing the City's allocable costs of owning the hospital.[11]

The PRRB affirmed, but it relied principally on the clause in the 1981 agreement providing that upon the expiration of the lease, "the proceeds of the [Center's] operations would revert to the City." Id. at 35. Reading its decision generously, the PRRB appears also to have relied upon five other factors (only one of which had been mentioned by the intermediary) indicative, in its view, of the City's control over the Center: (1) the power given in the agreement to the mayor of the City to approve or reject non-physician candidates selected by AMM to fill four of the nine seats on the Center's Board of Directors; (2) the City's assistance to the Center in financing the construction of the new facility by issuing bonds; (3) a provision in the agreement for the City to take title to all furniture, equipment, and so on, at the expiration of the lease; (4) a clause in the 1963 lease stating that it would be in the City's best interest to lease the hospital to NBH; and (5) the City's extension of the Center's deadline for substantially completing the new facility without requiring additional consideration from the Center. Id. at 35–36.[12]

In granting summary judgment in favor of the Secretary, the District Court held that the PRRB's decision was supported by substantial evidence. The court thought it unnecessary to analyze all the factors on which the PRRB had relied, however; in that court's view, the mayor's power to approve or reject four members of the Center's Board of Directors was sufficient in itself to sustain the finding of relatedness on the ground that the City controlled the Center.

## II

■ Our review in this case, like that of the District Court, is limited to determining whether, on the record as a whole, the PRRB's decision is supported by substan-

10. The Regional Office pointed to four indicia of the City's "control of major decision [sic] and/or functions": (1) the City's right to cancel the agreement if the Center did not substantially complete the new facility by July 1, 1985; (2) a provision in the 1981 agreement limiting the Center's ability to transfer or change the number and use of hospital beds without prior written consent of the City; (3) a provision in the agreement providing that if a convalescent facility previously owned by NBH and conveyed to the Center was not used by the Center for three consecutive years, title would automatically vest in the City; and (4) the City's issuance of $6,500,000 of bonds to finance the construction of the new facility. The Regional Office also expressed the view that an agreement whereby the City would reimburse the Center for costs incurred in providing health care services to indigents, but only in an amount not to exceed the annual rental payments made to the City by the Center, was "a vehicle to maximize Medicare

Reimbursement while the hospital does not incur any actual expense." Id. at 264.

11. The amounts allowed by the intermediary were $15,990 for interest expense, $75,990 depreciation, and $1200 for administration fees, totaling $93,180. The intermediary's adjustment reduced the Center's Medicare reimbursement by more than $350,000. Id. at 228–29.

12. At oral argument it was also suggested that the City's contributions to the Center for costs associated with the care of indigents, which were increased (coincidentally with the beginning of the new lease) to an amount not to exceed the Center's rental expenses, is an indication of control. The Board did not rely on that fact in its decision and we are therefore obliged not to take this evidence into account. See SEC v. Chenery Corp., 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943).

tial evidence.[13] Our review proceeds as if this case were an immediate appeal from a decision reached after an administrative hearing on the record. The District Court's decision is not entitled to any particular deference. *Walter O. Boswell Memorial Hosp. v. Heckler,* 749 F.2d 788, 790 n. 2 (D.C.Cir.1984); *see Regents of the Univ. of California v. Heckler,* 771 F.2d 1182, 1187 (9th Cir.1985) ("[W]e review the Secretary's action under the same standard as did the district court."). Before discussing the record evidence, however, we pause briefly to describe the concept of "related organizations" and its significance in the labyrinth of Medicare reimbursement regulations.

### A

The Medicare program established by Title XVIII of the Social Security Act provides federally funded health insurance for the aged and disabled. Under the Act, payments on behalf of eligible individuals are made to health care providers with whom the Secretary has entered into "provider agreements." 42 U.S.C. § 1395cc (1982). For cost reporting years prior to October 1, 1983, these providers are reimbursed for their "reasonable costs"—costs "actually incurred, excluding therefrom any part of the incurred cost found to be unnecessary in the efficient delivery of needed health services" as "determined in accordance with regulations" promulgated by the Secretary. *Id.* at §§ 1395f(b), 1395x(v)(1)(A) (1982); *see* 42 C.F.R. § 413.9(b) (1986).

■ The Secretary's regulations set forth with particularity the methods to be used in determining the reasonable costs for which providers will be reimbursed.

The overall objective of these regulations is to ensure that the Medicare program pays only for the cost of the services that providers render to beneficiaries—no more and no less.[14] In accordance with this objective, reimbursement is allowed for both direct and indirect costs incurred by providers, including an allocable portion of the rent a provider pays to occupy and operate facilities owned by others. 42 C.F.R. § 413.130(b) (1986).

The Secretary has decided, however, that when services, facilities, or supplies are furnished to a provider by a "related organization," there is "a significant likelihood that charges incurred by providers ... will be artificially inflated because of the absence of bona fide arms-length bargaining." *American Hosp. Management Corp. v. Harris,* 638 F.2d 1208, 1212 (9th Cir.1981). To ensure that the Medicare program will not bear the costs of such self-dealing, the Secretary has promulgated a prophylactic rule defining reimbursable reasonable costs in the context of transactions between related organizations. "Reasonable costs" for such a provider are the actual costs incurred by the related supplier, rather than the amount the provider pays to it. 42 C.F.R. § 405.427(a) (1982). *See Pasadena Hosp. Ass'n v. United States,* 618 F.2d 728, 723–33 (Ct.Cl.1980); *Goletta Valley Community Hosp. v. Schweiker,* 647 F.2d 894, 897 (9th Cir.1981). As other courts have said, the related organization rule thus "serves to screen out both costs not actually incurred and unreasonable costs. That is to say, the regulation precludes reimbursement for cost increases due solely to transactions between different parts of a single economic unit,

13. Under the Act, the district court's review of PRRB decisions is governed by the scope of review provisions of the Administrative Procedure Act, 5 U.S.C. § 706. *See* 42 U.S.C. § 1395*oo*(f)(1) (1982). Because the PRRB's decision is the result of "an agency hearing provided by statute," a reviewing court must set aside PRRB decisions found to be "unsupported by substantial evidence" after the court has reviewed the whole record. 5 U.S.C. § 706(2)(E) (1982). *See Monsour Medical Center v. Heckler,* 806 F.2d 1185, 1190 (3d Cir.1986), *cert. denied,*

—— U.S. ——, 107 S.Ct. 2481, 96 L.Ed.2d 373 (1987).

14. In statutory terms, the objective is to ensure that "the necessary costs of efficiently delivering covered services to individuals covered by the [Medicare program] will not be borne by individuals not so covered, and the costs with respect to individuals not so covered will not be borne by [the Medicare program]." 42 U.S.C. § 1395x(v)(1)(A) (1982); *see* 42 C.F.R. § 413.9(b) (1986).

and it polices 'sweetheart' contracts with suppliers that may inflate costs to the provider." *Valley View Community Hosp. v. United States,* 679 F.2d 857, 861 (Ct.Cl. 1982) (quoting *Medical Center of Independence v. Harris,* 628 F.2d 1113, 1119 (8th Cir.1980)).

█ The rule is prophylactic in the sense that it involves a judgment that the probability of abuse in transactions between related organizations is significant enough that it is more efficient to prevent the opportunity for abuse from arising than it is to try to detect actual incidents of abuse. *See Stevens Park Osteopathic Hosp. v. United States,* 633 F.2d 1373, 1379 (Ct.Cl. 1980). As a result, the rule limits reimbursement for many transactions between related parties to levels below what might otherwise be entirely reasonable and reimbursable "costs" if incurred by providers dealing with unrelated suppliers. The rule's potential over-inclusiveness does not, however, affect its validity; the Secretary need not promulgate regulations with exacting precision:

> [I]n a program as complex as the Medicare program, with its large number of providers and suppliers and with its range of supplies and services, the Secretary, in his regulations may make ... generalized classifications governing the methods of calculating "reasonable costs" when it is obvious that individualized cost calculations are both not administratively practical and unduly expensive.

*Fairfax Hosp. Ass'n v. Califano* 585 F.2d 602, 606 (4th Cir.1978) (footnote omitted) (citing *Weinberger v. Salfi,* 422 U.S. 749, 773–80, 95 S.Ct. 2457, 2470–74, 45 L.Ed.2d 522 (1975)).

█ The potential breadth of the related organizations rule is tempered, however, by the kinds of "relatedness" to which it is applicable.[15] Specifically, the Secretary has focused on two types of relatedness that, in his view, involve an unacceptably high risk of abuse. Thus, the rule only comes into play when the relation between a provider and a supplying entity is one of "ownership" or "control."[16] In this case, we focus specifically on the type of relatedness on which the PRRB based its decision —namely, "control"—and, in accordance with the Secretary's definition of that term, we ask whether the City "has the power, directly or indirectly, significantly to influence or direct the actions or policies of" the Center. 42 C.F.R. § 405.427(b)(3) (1982).

### B

Our examination of the record convinces us that the district court erred in concluding that substantial evidence supports the decision of the PRRB. We first examine the factor considered by the District Court to be dispositive evidence of such control, and then briefly discuss the PRRB's reliance on other record evidence.

The District Court found substantial evidence of control in a clause of the 1981 agreement conferring on the mayor of the City the power to approve four candidates selected by AMM to serve on the Center's nine-member Board of Directors. The court reasoned that:

> The veto power, if used forcefully, can have a significant influence on the composition of the board. Moreover, knowl-

---

**15.** As the Court of Claims has explained, the prophylactic nature of the related organizations rule does not lessen the need to show actual relatedness:

> [T]he need for a clear and easily applicable regulation to prevent abusive self-dealing is such that some over-breadth in the coverage of that regulation is justifiable..... The prophylactic nature of a rule can excuse over-breadth but it should not be made a reason for it. Whether or not parties are related must be determined independently of the prophylactic nature of 42 C.F.R. § 405.427 (1981), which can then only help justify the

application of the regulation to situations in which no abuse actually is found.

*West Seattle General Hosp. v. United States,* 674 F.2d 899, 904 (Ct.Cl.1982).

**16.** The regulation provides:

> Costs applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are includable in the allowable cost of the provider at the cost to the related organization.

42 C.F.R. § 405.527(a) (1982).

edge that *reappointment* may be barred if the board's decisions displease the mayor could potentially affect the actions of the board members. It was therefore reasonable for the [PRRB] to infer that persons approved would be influenced by gratitude for approval and by a desire to maintain the opportunity for reappointment.

■ We disagree with the district court's analysis for several reasons. We acknowledge that the continued operation of the hospital was a matter of great importance to the City and to its people. It is entirely understandable that the City wished to have some check on the policy-making body of the hospital. Our examination of the mayor's power convinces us that the City was willing to accept a very modest role, however. Although not dispositive, we note that the "control" envisioned by the District Court remained entirely potential; affidavits by the current and former mayors of the City indicate that they approved all the candidates selected by AMM without any independent investigation of their background. J.E. at 68, 70. There are additional reasons, however, that convince us that whatever potential role the mayor's veto power conferred upon the City in its relations with the Center, that role cannot without more be equated with "the power, directly or indirectly, *significantly* to influence or direct the actions or policies of" the Center.

■ First, the mayor's power is limited to vetoing candidates for a minority of the seats on the Center's Board of Directors; it offers no opportunity for the mayor to name a single member of the Board.[17] Merely having such a negative potential check cannot be equated with the power to place agents of the City on the Center's board. Nor is there any evidence in the record that *any* of the Center's directors is or ever has been associated with the City in any meaningful capacity.[18]

Second, from the terms of the agreement, it seems extremely unlikely that any gratitude that approved directors might have toward the mayor, or any desire such directors may have to maintain their board positions, would result in a board decision designed to curry favor with the City should its interests diverge from those of the Center on a particular matter. For if there is a controlling voice from the outside heard in the Center's boardroom, that voice, rather than belonging to the City, belongs to AMM. One director, the hospital administrator, is and must be "AMM's employee[ ] and on AMM's payroll." *Id.* at 295. Two more directors may be AMM employees, and two must be "active physicians presented by the medical staff and agreed upon by American [AMM]." *Id.* at 275. Even the four non-physician citizen board members—those subject to the mayor's approval—are appointed by AMM. *Id.* In sum, AMM is vested with power to select or appoint all nine of the Center's directors. It is not surprising, therefore, that the Regional Office, on whose opinion the intermediary relied, specifically found that "any approval of Board Members by the Mayor of Biloxi is a mere formality as AMM does the actual selections." *Id.* at

---

**17.** This case is therefore unlike cases in which courts have held that an organization's *representation* on a provider's board of directors is an indication of relatedness. *See, e.g., Monsour Medical Center v. Heckler,* 806 F.2d 1185, 1194 (3d Cir.1986); *Goletta Valley Community Hosp. v. Schweiker,* 647 F.2d 894, 896–97 (9th Cir. 1981).

**18.** The Secretary also asks us to infer that the Center is related to the City because the Chairman of the Center's Board, Parker Rhett, had been one of NBH's directors, and the PRRB has determined that NBH was itself an organization related to the City. We find this argument unavailing for two reasons, each of which would

alone be dispositive. First, the PRRB merely stated that the intermediary had argued that Rhett's role created "the appearance of related parties"; the PRRB did not itself rely on this factor so it cannot properly be urged in support of the PRRB's decision. *See SEC v. Chenery Corp.,* 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626 (1943). Moreover, although NBH and the City were previously determined to be "related," there is no evidence that would otherwise link Mr. Rhett personally to the City. He has never been an employee or an official of the City, and he was not tied to the mayor by any other evidence in the record.

265.[19] Finally, uncontradicted affidavits by the two former mayors indicated that each regarded the mayoral approval power as merely a "courtesy."

These facts, which neither the District Court nor the PRRB discussed, overwhelmingly suggest that any influence the City might exert through the mayor's "veto" power falls well short of that required to establish "control" under the regulation— *i.e.*, power "*significantly* to influence or direct the actions or policies" of the Center. 42 C.F.R. § 405.427(b)(3) (1983) (emphasis added).

We realize, of course, that the District Court was properly concerned not with the actual but with the potential ability of the City to influence the Center. Indeed, the power of the sword of Damocles is not that it falls but that it hangs. Here, though, the power that the City has over the Center is more akin to the power that the butterknife of Damocles might have on those above whom it hangs. Realistically, if the City had any ability to influence the Center's actions or policies, it was not "significant." It is thus below the threshold necessary for the Secretary to invoke the prophylactic effect of the related organization rule. We must conclude, therefore, that the PRRB's decision, insofar as it relies on this provision in the agreement, is unsupported by substantial evidence.[20]

**C**

■ Our review of the other factors upon which the PRRB (but not the District Court) relied indicates that they provide no substantial support for the finding of relatedness. In making its determination that the City had the power to control the Center, the PRRB gave considerable weight to two clauses within a section of the 1981 agreement setting forth the terms governing the distribution of hospital assets upon the termination of the lease. The first clause, which the PRRB stated "most clearly evidences the relatedness" of the City and the Center, J.E. at 35, provided that "[u]pon termination of any twenty-five (25) year term of this lease or any renewals thereof, all funds derived from the operation of said hospital shall become the property of the [City]." *Id.* at 345. The second clause provided for the City to acquire title to all furniture, equipment, instruments, and other supplies when the lease expires.

We believe this evidence is not probative of control. With respect to the reversion of funds clause, we make two observations. First, the possibility that this clause will ever become operative is extremely remote; the agreement contemplated that the Center would substantially complete the construction of a new facility to replace the old hospital by July 1, 1985—long before the 25 year lease of the old facility would expire.[21] Second, even assuming the unlikely

19. The Regional Office adduced other reasons for believing that the Center and the City were related. *See supra* note 10. It made the statement quoted above in support of its view that there was a separate "related entity issue ... between [AMM] and the Center." J.E. at 264.

20. Appellant argues that the PRRB's decision in this case is arbitrary and capricious because its reasoning is inconsistent with a prior decision. In *Hospital Dr. Tito Mattei,* Medicare and Medicaid Guide (CCH) ¶ 34,869 (July 1, 1985), the Secretary's delegate affirmed a decision by the PRRB finding that a hospital and the Puerto Rico Department of Health were not related parties even though the Department appointed all seven members of the hospital's original board of directors. Because we find that substantial evidence does not support the PRRB's decision, we do not need to address this argument.

21. The Secretary argues that the lease would expire in 1988, and thus, it is reasonable to assume that the reverter provision "could have influenced [the Center's] actions" because "it was possible that the intended construction would be delayed." Brief of Appellee at 30. The Secretary's premise is mistaken. The twenty-five year lease term, although originally commencing in 1963, was revised in the 1981 agreement which provides "the term of this lease as revised by this Agreement is to be for twenty-five (25) years, commencing July 1, 1981...." J.E. at 347. It is thus clear that the reverter provision would become operative only if the Center failed to perform its other responsibilities under the agreement—responsibilities that, if not performed, were themselves a sufficient reason for the City to terminate the lease. *See id.* at 344 (agreement allows the City to re-enter and assume operation of facilities should Center not "substantially complete" construction of new facilities by July 1, 1985). For these rea-

event that the old facility were kept under lease for 25 years, we find it difficult to believe that the prospect of having to disgorge proceeds (which appears, in context, to mean no more than cash on hand) 25 years down the road will have any significant bearing on the present polices and actions of the Center.

The second clause, governing the ownership of used chattels 25 years from now, is similarly no evidence of control. Indeed, the PRRB appears to have ignored one of its critical features: the City would acquire title to equipment "provided or acquired by [the Center] during the term of the lease" *only* "upon payment of the undepreciated value of said equipment less and except equipment in place July 1, 1981." *Id.* at 45. That the clause offers no substantial support for the PRRB's decision is obvious. We note finally that the section of the agreement in which these clauses are found is self-evidently designed to ensure an orderly transition between operators should the Center discontinue operating the old facility at the end of the 25 year lease term and the City wish to install a new operator. We find nothing in this section that substantially suggests a relationship of control; in fact, it is the very type of provision one would expect to find in this type of lease, where continuity of service is not only important, but may be critical.

■ We need not discuss in detail the remaining factors that the PRRB regarded as evidence of control, for whether they are viewed individually or in the aggregate, they cannot fairly be said to suggest that the City controls the Center. For example, as further evidence of control, the PRRB pointed to the City's agreement to assist the Center in constructing new facilities by issuing bonds. Such financing arrangements are commonplace apart from any suggestion of control;[22] they enable the hospital to get access to lower cost financing through the City's power to issue tax-exempt bonds and to re-lend the proceeds to the hospital operator. This is as consistent with an arms-length transaction as with a control relationship and thus is not probative evidence. In any event, the only indication in the record that the City issued bonds "to construct and furnish a new facility" is a letter from the Secretary's Regional Office to Blue Cross delivered during the intermediary's consideration of the Center's claims. *Id.* at 264, 33. Neither the Regional Office nor the PRRB cited any other evidence of this bond issue, we find none in the record, and the Center flatly denied that any such bonds were issued.[23] Without a better basis for this assertion, we cannot conclude that there is substantial evidence that the bonds were issued and hence it cannot support the PRRB's decision.

### III

Our review of the record convinces us that the evidence relied upon by the PRRB, even when viewed cumulatively, does not provide substantial support for its conclu-

sons, this provision is unlike the reverter provision found to be substantial evidence of control in *Richlands Medical Ass'n v. Harris*, 651 F.2d 931 (4th Cir.1981), which became operative on *any* termination of the lease. *Id.* at 933 n. 2.

Indeed, taken in the context of the agreement as a whole, the reverter clause suggests that NBH's assignment of its lease to Center was the product of bona fide, arm's-length bargaining. Uncontroverted affidavits submitted to the District Court indicate that the 1981 agreement "was the product of approximately two weeks of very intense, and sometimes heated negotiations," with "both the City of Biloxi ... and the Center ... acting entirely at arm's length during those negotiations." J.E. at 59 (affidavit of Lloyd T. Moon, former president of NBH); *id.* at 66 (affidavit of Jeremiah J. O'Keefe, former mayor of Biloxi).

**22.** In 1983, for example, government entities issued $9.9 billion in revenue bonds for hospital-related projects. *See* J. ELROD & J. WILKINSON, HOSPITAL PROJECT FINANCING UNDER PROSPECTIVE PAYMENT 4, *reprinted in,* J.E. at 13, 16.

**23.** The Secretary urges us to consider $31,135,-000 in revenue bonds issued by the City in 1985. This evidence, however, was not presented to the PRRB and is thus not a part of this appeal. Even if we could advert to the matter, however, as the Secretary notes, it would not be sufficient but only "one more" datum pointing toward a control relationship; since we find that there are no other indicia of control, this one could hardly be dispositive.

sion that the City and the Center were related by common control within the meaning of the Secretary's regulations. Because they found that the Center and the City were related, however, the intermediary, the PRRB, and the District Court expressed no view on the reasonableness of the rental payments the Center actually made to the City. Such a determination properly lies in the first instance with the Center's fiscal intermediary; as a result, we express no view on this matter. Accordingly, the judgment of the District Court is

*Reversed and remanded for further proceedings consistent with this opinion.*