723 A.2d 545

GLASGOW NURSING HOME, INC.

v.

DEPARTMENT OF HEALTH AND MENTAL HYGIENE.

No. 581, Sept. Term, 1998.

Court of Special Appeals of Maryland.

Jan. 29, 1999.

650

Nancy E. Gregor (Kramon & Graham, P.A. on the brief), Baltimore, for appellant.

Adina N. Amith, Asst. Atty. General (J. Joseph Curran, Jr., Atty. General and John F. Lessner, Asst. Atty. General on the brief), Baltimore, for appellee.

Argued before EYLER, PAUL E. ALPERT (Ret., specially assigned) and ERIC M. JOHNSON (specially assigned), JJ.

EYLER, Judge.

The central issue presented by this appeal is whether there is substantial evidence to support a decision by the Nursing Home Appeal Board[1] (the Board) that disallowed reimbursement of certain expenses claimed by Glasgow Nursing Home, Inc., appellant, under the Maryland Medical Assistance Program (Medicaid Program). We hold that it was supported by substantial evidence.

## I. Facts

Appellant is a licensed nursing facility located in Dorchester County, and a participant in the Medicaid Program that is administered by the Department of Health and Mental Hygiene, appellee. Prior to April 1982, appellant's stock was held entirely by Howard Greenhawk and other members of the Greenhawk family, including Howard's parents, Norman and Aileen Greenhawk. Appellant operated its nursing home on land owned by Norman and Aileen Greenhawk.

In April 1982, John R. Marcello, Jr. purchased all of the stock of appellant. Sometime prior to that transaction, Howard Greenhawk and Marcello had become friends, and Marcello had moved into Howard Greenhawk's home. They continued to live in the same home until at least 1991. During that time, Marcello paid no rent. Also in April, 1982, Norman and

---

1. The Nursing Home Appeal Board hears appeals with respect to determinations by the Maryland Medical Assistance Program of amounts due to or owed by a participating provider. COMAR 10.01.09.01–.02 (1998).

Aileen Greenhawk sold a portion of the real estate to Howard Greenhawk, and appellant entered into a lease agreement with Norman, Aileen, and Howard Greenhawk for the building and land on which the nursing home was located. Appellant continued to lease the premises from the Greenhawks until January 20, 1988.

In March, 1983, Marcello had obtained a loan of $100,000 from Provident State Bank, pledging his stock in appellant as collateral. Provident also required that the real property on which the nursing home was located secure the loan. The Greenhawks assisted Marcello by pledging the real property as collateral. By virtue of the pledge of appellant's stock, Provident held a proxy, which enabled it to elect appellant's board of directors. In February, 1985, Provident exercised its proxy and Howard Greenhawk, who had served as a director prior to that time, was not elected and did not serve on appellant's board at any time thereafter.

In August, 1985, the Greenhawks released Marcello from further liability on a promissory note for $200,000 which Marcello gave to the Greenhawks when he purchased the stock in appellant. This release was executed apparently without consideration.

On January 20, 1988, appellant purchased the land and buildings from the Greenhawks for a price of $650,000. Howard Greenhawk had informed Marcello that he intended to sell the real estate and would sell to a third party if appellant did not wish to purchase it. Appellant financed the purchase with a loan from Maryland National Bank in the amount of $250,-000 and a loan from Howard Greenhawk in the amount of $400,000, secured by mortgages on the property. In 1990, appellant refinanced its indebtedness. A new mortgage was granted to Maryland National Bank securing a loan in the amount of $485,000, and a new mortgage was granted to Howard Greenhawk in the amount of $95,095.51. As part of the transaction, Howard Greenhawk reduced the principal amount of the debt owed to him by $100,000, without consideration.

Prior to the events giving rise to this appeal, in proceedings relating to fiscal years 1982 to 1986, the Medicaid Program contended that Howard Greenhawk and appellant were related organizations, and as a result, they were treated as a single entity for purposes of reimbursing lease costs. The Board and the Circuit Court for Dorchester County upheld that position.

The events giving rise to this appeal began when appellant submitted cost reports for fiscal years ending December 31, 1988 through December 31, 1991, seeking reimbursement from the Medicaid Program for the costs of care of appellant's patients. The costs included interest payments and depreciation expenses associated with the purchase of the real property from the Greenhawks in 1988. Appellee's audit agency, Clifton, Gunderson & Co., initially disallowed costs for both the loan between Howard Greenhawk and appellant and the loan from Maryland National Bank. The audit agency's position was based on the assertion that the sale was between "related parties" within the meaning of the applicable regulations, and consequently, the costs were not reimbursable. Appellee eventually reimbursed appellant for a portion of the costs incurred in obtaining the loan from Maryland National Bank.

Appellant appealed the disallowance of the costs to the Board. In a decision dated October 18, 1993, the Board affirmed appellee's decision with respect to the bulk of the disallowed items. Appellant appealed to the Circuit Court for Dorchester County. On October 4, 1994, the circuit court held that certain factors relied upon by the Board were inappropriate, vacated the Board's decision, and remanded the case to the Board for reconsideration. In doing so, the circuit court explained that it could not tell from the Board's decision whether its conclusion was premised on the cumulative effect of all the factors, including the ones that the circuit court held to be inappropriate.

On April 10, 1996, the Board, focusing on four factors deemed to be permissible by the circuit court, affirmed its prior decision. The four factors relied upon were:

1. The existence of a continuing personal relationship between Howard Greenhawk and Marcello.

2. As security for a pre–1988 loan by Provident State Bank to Marcello, Howard Greenhawk pledged part of the real property on which the nursing home was located.

3. In August, 1985, the Greenhawks released Marcello from liability on a promissory note for $200,000 executed when Marcello purchased the stock in appellant.

4. In 1990, two years after the sale of the property in January, 1988, Howard Greenhawk agreed to a $100,000 reduction in the purchase price by reducing the principal of the debt owed to him by $100,000.

On February 6, 1998, the circuit court affirmed the Board's decision.

## II. Questions Presented

1. Were the parties to the 1998 sale of the building and real estate upon which the nursing home is operated "related parties" under applicable regulations?

2. Does the decision of the Court of Appeals of Maryland in *Liberty Nursing Ctr., Inc. v. Department of Health and Mental Hygiene*, 330 Md. 433 [624 A.2d 941] (1993), require that all interest paid to a non-related lender be reimbursed as an allowable cost?

## III. Standard of Review

Generally, there are two standards of judicial review of the decisions of administrative agencies in Maryland.[2] *Co-*

---

2. With respect to the scope of judicial review of an agency decision, the State Government Article of the Maryland Annotated Code, § 10–222(h) (1995) provides in part:

(h) *Decision.*—In a proceeding under this section, the court may:
(1) remand the case for further proceedings;
(2) affirm the final decision; or
(3) reverse or modify the decision if any substantial right of the petitioner may have been prejudiced because a finding, conclusion, or decision:

*lumbia R.C.A. v. Montgomery County,* 98 Md.App. 695, 698, 635 A.2d 30 (1994). When an agency resolves a pure issue of law, a reviewing court will accord no..deference to the agency determination and may substitute its judgment for that of the agency. *Prince George's County v. Brown,* 334 Md. 650, 658, 640 A.2d 1142 (1994); *Liberty Nursing Ctr., Inc. v. Department of Health and Mental Hygiene,* 330 Md. 433, 443, 624 A.2d 941 (1993); *State Election Bd. v. Billhimer,* 314 Md. 46, 59, 548 A.2d 819 (1988). When an agency resolves either issues of fact or mixed issues of law and fact, however, a reviewing court must defer to the factual findings of the agency and to inferences drawn from the facts. *Motor Vehicle Admin. v. Karwacki,* 340 Md. 271, 280, 666 A.2d 511 (1995); *Billhimer,* 314 Md. at 58–59, 548 A.2d 819; *Pemberton v. Montgomery County,* 275 Md. 363, 367, 340 A.2d 240 (1975). An agency's factual conclusions will not be disturbed on appeal if supported by substantial evidence in the record. *Karwacki,* 340 Md. at 280, 666 A.2d 511; *Liberty Nursing,* 330 Md. at 442, 624 A.2d 941.

■■■■ While an appellate court normally may affirm appeals from trial court judgments on grounds not explicitly invoked by the court in rendering its decision, an appellate court may only affirm the decision of an administrative agency if the decision is "sustainable on the agency's findings and for the reasons stated by the agency." *United Steelworkers v. Bethlehem Steel,* 298 Md. 665, 679, 472 A.2d 62 (1984). With respect to issues of fact, therefore, we ask whether "the evidence before the [agency] was 'fairly debatable' such that a reasoning mind could reasonably have reached the same result as did the administrative agency upon a fair consideration of

---

(i) is unconstitutional;

(ii) exceeds the statutory authority or jurisdiction of the final decision maker;

(iii) results from an unlawful procedure;

(iv) is affected by any other error of law;

(v) is unsupported by competent, material, and substantial evidence in light of the entire record as submitted; or

(vi) is arbitrary or capricious.

the factual picture painted by the entire record before that body." *Pemberton,* 275 Md. at 367–68, 340 A.2d 240.

The first question presented by this case is a mixed question of law and fact, and we must affirm the decision of the Board if supported by substantial evidence. The second question presents a pure issue of law that is subject to plenary review.

## IV. Discussion

### A. Regulatory Scheme

Costs associated with interest payments and depreciation may be reimbursed under the Medicaid Program. Such reimbursement generally is governed by Maryland regulations and federal Medicare reimbursement regulations. *See* 42 C.F.R. § 413 (1997); COMAR 10.09.06.09.B (1998). The federal regulations are amplified in the Provider Reimbursement Manual (PRM), which serves as a guide to reimbursable costs for the Medicare and Medicaid Programs. Nursing homes that participate in the Maryland Medicaid Program are paid pursuant to COMAR 10.09.10.[3]

The Medicare regulation 42 C.F.R. § 413.17 provides guidelines for determining whether organizations conducting business with a Medicaid provider are related organizations, and limits the reimbursement a provider may claim for transactions with such organizations. Section 413.17 provides in part:

(a) *Principle.* ... [C]osts applicable to services, facilities, and supplies furnished to the provider by organizations related to the provider by common ownership or control are

---

**3.** At the time of both the Board's 1993 decision and its 1996 decision upon remand from the Circuit Court for Dorchester County, COMAR 10.09.10 and COMAR 10.09.11 apparently governed appellant's claims for reimbursement. During that time, COMAR 10.09.10 applied to skilled nursing facility services and COMAR 10.09.11 applied to intermediate care facility services. Effective December 29, 1997, COMAR 10.09.11 was repealed, and COMAR 10.09.10 was amended to encompass the substance of both previous chapters under the new chapter heading "Nursing Facility Services." *See* 24 Md. Reg. 1473–75, 1758 (1997). All references in the present opinion will be to the new regulations at COMAR 10.09.10.

includable in the allowable cost of the provider at the cost to the related organization. However, such cost must not exceed the price of comparable services, facilities, or supplies that could be purchased elsewhere.

(b) *Definitions.* (1) *Related to the provider.* Related to the provider means that the provider to a significant extent is associated or affiliated with or has control of or is controlled by the organization furnishing the services, facilities, or supplies.

(2) *Common ownership.* Common ownership exists if an individual or individuals possess significant ownership or equity in the provider and the institution or organization serving the provider.

(3) *Control.* Control exists if an individual or an organization has the power, directly or indirectly, significantly to influence or direct the actions or policies of an organization or institution.

*Cf.*, COMAR 10.09.10.01.B(44) (1998). Control is further defined in the PRM as "any kind of control, whether or not it is legally enforceable and however it is exercisable or exercised." PRM, Part 1, § 1004.3, Medicare & Medicaid Guide (CCH) ¶ 5700 at 1889. The PRM explains further, "It is the reality of control which is decisive, not its form or the mode of its exercise." *Id.* For this reason, control must be determined primarily upon the facts and circumstances of each case. *See id.*

Under § 413.17, the federal government considers services obtained by a provider from a related organization to be "obtained from itself" for purposes of reimbursement. 42 C.F.R. § 413.17(c)(2) (1997). Expenses based on such services are reimbursed, therefore, "at the cost to the supplying organization" or at the market price for such services if lower than the supplier's cost. *Id.*

In accordance with the above principles, interest expenses generally may be reimbursed under the Medicaid Program only if "incurred on indebtedness established with lenders or lending organizations not related through control, ownership,

or personal relationship to the borrower." 42 C.F.R. § 413.153(c)(1) (1997). The regulation explains that the existence of any of these factors

> could affect the "bargaining" process that usually accompanies the making of a loan, and could thus be suggestive of an agreement on higher rates of interest or of unnecessary loans. . . . The intent of this provision is to assure that loans are legitimate and needed, and that the interest rate is reasonable. Thus, interest paid by the provider to . . . related organizations of the provider would not be allowable.

*Id.* The Court of Appeals has held that, for the purpose of determining whether parties to a loan are "related through control" under this regulation, the pertinent transaction is the loan transaction, not the underlying business transaction that gives rise to the need for a loan. *See Liberty Nursing,* 330 Md. at 447–48, 624 A.2d 941. It is clear, therefore, that loan expenses based on a loan from an unrelated lender may be reimbursed by the Medicaid Program even if the underlying sale is between related organizations.

In such cases, however, loan expenses are limited by additional reimbursement principles which hold that interest expenses on loans used to purchase nursing home properties are reimbursable only to the extent that the interest is "[n]ecessary and proper." 42 C.F.R. § 413.153(a)(1) (1997). To be necessary, interest expenses must be "incurred on a loan made to satisfy a financial need of the provider," and "incurred on a loan made for a purpose reasonably related to patient care." *Id.* § 413.153(b)(2). This regulation explicitly limits certain loans under the latter requirement:

> (d) *Loans not reasonably related to patient care.* (1) The following types of loans are not considered to be for a purpose reasonably related to patient care:
>
> (i) For loans made to finance acquisition of a facility, that portion of the cost that exceeds—
>
> . . .
>
> (B) The cost basis determined under § 413.134(g). . . .

*Id.* § 413.153(d). The "cost basis," which acts as a cap on reimbursement for such loans, is affected by whether the underlying sale was bona fide: "If the purchaser cannot demonstrate that the sale was bona fide ... the purchaser's cost basis may not exceed the seller's cost basis, less accumulated depreciation." *Id.* § 413.134(g)(4). Although this section does not refer to § 413.17 pertaining to related organizations, a sale between related organizations is not a bona fide sale under § 413.134(g). *Liberty Nursing,* 330 Md. at 441, 624 A.2d 941. *See also* PRM, Part 1, § 104.15, Medicare & Medicaid Guide (CCH) ¶ 4685 at 1665–14. Section 413.134(g) is therefore in harmony with § 413.17(c)(2), above, in treating related organizations as one entity for reimbursement purposes. Thus, under the above regulations as they pertain to the present case, reimbursement generally is disallowed for a provider's interest expenses on a loan from a related lender, and, where the underlying sales transaction is between related organizations, interest expenses on a loan from an unrelated lender generally are reimbursable only to the extent that such expenses are based on that portion of the loan that reflects the seller's "cost basis," less accumulated depreciation.

## B. Arguments on Appeal

Appellant, with respect to the first issue on appeal, contends that the sale of the nursing home property in 1988 was a bona fide transaction because appellant and Howard Greenhawk were not related organizations at any time subsequent to February 1985.[4] Appellant states that, after February 1985, Howard Greenhawk's involvement was limited to his obligations as a landlord and to supervision of maintenance services performed by his subcontractors. Thus, appellant concludes that the Board's decision that the parties were related

---

4. We note that, since appellant and Howard Greenhawk closed on the sale and on the initial loans to finance the sale on the same date, appellant's argument that it was not related to Howard Greenhawk when it closed on the sale applies to appellant and Howard Greenhawk in their capacities as buyer/borrower and seller/lender on that date, respectively.

in 1988 is not supported by substantial evidence. The four factors above, cited by the circuit court as pertinent to the determination as to whether appellant and Howard Greenhawk were related to one another by control, are not directly addressed by the appellant in its brief. In an apparent reference to these factors, however, appellant claims the Board did not address the method or means of control between it and Howard Greenhawk, even though, according to appellant, overwhelming authority suggests that administrative agencies must identify "clear and concrete indicia of control" before they can consider two organizations related under the regulations. In any event, appellant does not argue that the four factors distilled by the circuit court on the prior appeal of this case are otherwise inapplicable to the issue of control, nor does appellant contest the relevance of the four factors to all of the potential decision points at which a relatedness analysis could be directed throughout the relevant period, 1988 to 1991.[5]

Appellee argues that there was competent evidence in the record to support the Board's conclusion that appellant and Howard Greenhawk were related through control. Appellee emphasizes that a relationship of control may be either direct or indirect under the regulations, that control may be found when a relationship merely renders the exercise of control possible, and that prior cases have endorsed a practical approach to the determination of control, in which the relationship is considered as a whole. Appellee concludes that the four factors considered by the Board, and the evidence sup-

---

**5.** The parties make no clear effort to identify and distinguish between several possible focal points for a § 413.17 analysis that may be implicated by the various bases for the individual reimbursement requests and any changes that may have occurred in the relationship during the relevant period. It appears that separate § 413.17 analyses might have been applied to the initial loan transaction, to the refinancing transaction, and to each year of depreciation expenses incurred. We will treat the loan transaction in 1988 and other circumstances in existence at that time as the primary focal point for the § 413.17 analysis in this case, as that appears to have been the focus of the Board's decision and apparently is the focus of the parties in the present appeal.

porting those factors, constituted substantial evidence of a relationship of indirect control between appellant and Howard Greenhawk and that the Board reasonably determined that the two entities were related under the regulations.

With respect to the second issue, appellant contends that, even if the underlying transaction was between related parties, interest paid to an unrelated lender is fully reimbursable. Appellant relies on *Liberty Nursing, supra.* Appellee acknowledges that Maryland National Bank was not related to appellant at the time of the initial loan or during refinancing, but it argues that because appellant was related to Howard Greenhawk during the real property transaction, allowable interest should be limited to that portion of the loan that does not exceed the seller's cost basis as determined under 42 C.F.R. § 413.134(g).

## C. Analysis

### (1) Related Organizations

█ We reject appellant's suggestion that appellee was required to establish either the exact means or method of control between appellant and Howard Greenhawk, or the existence of legal associations between those entities that would facilitate direct control. The cases cited by appellant do not call for such a formal analysis. We conclude that appellee produced substantial evidence of indirect control to support the administrative determination that appellant and Howard Greenhawk were related organizations throughout the relevant time period. The conclusion that the loan and depreciation expenses are not reimbursable in this case flows from the decision that the parties were related from 1988 to 1991.

█ Section 413.17 has been construed broadly by federal courts to guard against the opportunity for abuse of Medicare funds. The prophylactic nature of the regulation "involves a judgment that the probability of abuse in transactions between related organizations is significant enough that it is more efficient to prevent the opportunity for abuse from arising than it is to try to detect actual incidents of abuse." *Biloxi*

*Reg'l Med. Ctr. v. Bowen,* 835 F.2d 345, 350 (D.C.Cir.1987).
*See also Stevens Park Osteopathic Hosp. v. United States,* 225
Ct.Cl. 113, 633 F.2d 1373, 1379 (Ct.Cl.1980). Thus, the regula-
tion may limit reimbursement between related organizations
for transactions that would be reimbursable among unrelated
organizations. *See Biloxi Reg'l Med. Ctr.,* 835 F.2d at 350.
Considerations of fairness in this regard are irrelevant. *See
Kidney Center v. Shalala,* 133 F.3d 78, 86 (D.C.Cir.1998);
*Stevens Park Osteopathic Hosp.,* 633 F.2d at 1379.

Although an agency's inquiry under the regulations is neces-
sarily status-based, the legal status of organizations with
respect to each other is not exclusively determinative. The
definition of control in § 413.17(b)(3) includes relationships
consisting of significant indirect influence, but this is further
interpreted by the PRM to include "any kind of control . . .
however it is exercisable or exercised." It follows that the
precise method of maintaining the influence need not be
defined.

Federal courts have found the existence of a power to
control based on evidence similar to the evidence presented
before the Board in the present case. In *Richlands Medical
Assoc. v. Harris,* 651 F.2d 931, 932 (4th Cir.1981), owners of a
hospital leased the hospital and accompanying facilities and
supplies to a group of four doctors on the hospital staff. The
doctors thereafter formed a professional association to lease
and operate the hospital, and employed one of the lessors,
William R. Williams, as administrator of the hospital. *Rich-
lands,* 651 F.2d at 932–33. On June 21, 1974, Mr. Williams
requested a rent increase from the existing rent of $4,600 per
month. *Id.* at 933. The board of the association approved an
increase to $7,000 per month effective July 1, 1974, and a
further increase to $10,000 per month effective in July 1975.
*Id.* The lease in force before the increase, and the $4,600 per
month rental rate, would not have expired until October 31,
1976. *Id.* The Secretary of Health and Human Services
disallowed the association's request for reimbursement for
lease expenses incurred during the fiscal year 1975, and the
association appealed the ruling. *Id.* at 932. Evidence at the

hearing indicated that the lessors of the hospital had received two offers from groups seeking to purchase the hospital and, consequently, had increased their own estimation of the rental value of the hospital. *Id.* at 933.

In its review of the decision, the Court of Appeals for the Fourth Circuit applied the related organizations regulation in force at the time, 42 C.F.R. § 405.427, which is virtually identical to present § 413.17,[6] and concluded that the physician's association and the lessors were related organizations. *Id.* at 933–34. The court based its decision in part on the long-standing relationship between the parties and the fact that Mr. Williams had requested a major rent increase as administrator of the hospital that would benefit him as a lessor of the hospital property. *Id.* at 934. The court affirmed the disallowance of reimbursement for this period of time, stating, "The danger inherent in 'controlled' dealings between provider and supplier is that the price of goods or services will be established through collusion rather than through arms-length dealing." *Id.* at 935.

In *Hospital Affiliates Int'l v. Schweiker,* 543 F.Supp. 1380 (E.D.Tenn.1982), the plaintiff Hospital owner, Hospital Affiliates International (HAI), devised a plan to finance the construction of a new hospital to replace the existing facility, which had fallen into disrepair. *Hospital Affiliates,* 543 F.Supp. at 1382. HAI wished to transfer the new hospital to a non-profit corporation while continuing to perform management functions at the hospital. *Id.* To effectuate this plan, Dr. Newell, a member of the board of HAI, put together a group that incorporated as the non-profit Downtown Hospital Association (DHA). *Id.* Both the administrator and comptroller of DHA were employees of HAI. *Id.* at 1387. The group had met with others, including the Chairman of the Health &

---

6. Section 413.17 now contains an exception to the general rule applicable to related organizations, under which a provider may demonstrate that its transaction with a supplying organization was open and competitive, or otherwise bona fide, and therefore fully reimbursable. Appellant does not contend on appeal that it is entitled to such an exception.

Educational facilities Board of Chattanooga (HEFB), to devise a way to have HEFB acquire the old hospital from HAI, issue bonds to finance the construction of the new hospital, and lease the new hospital to DHA. *Id.* at 1383. HEFB and HAI agreed at that time that DHA, though not a party to the agreement, would employ HAI to manage the new hospital. *Id.* At a subsequent closing involving multiple parties and transactions, the following result was obtained: "HAI owned the underlying fee in the land and was to manage the hospital; HEFB leased the land from HAI and owned the new hospital; DHA leased both the land and the building from HEFB." *Id.* Eventually, DHA accepted a wholly owned subsidiary of HAI as its management company without soliciting bids from other management companies and obtained a $200,000 loan from HAI for operating capital. *Id.* After these transactions, HAI requested $116,529 from Medicare to reimburse it for a loss incurred in the sale of the hospital, which it claimed was "attributable to its failure to depreciate the assets at as rapid a rate as they actually declined in value." *Id.* at 1384. HAI's claim was denied by a fiscal intermediary and that denial was affirmed by the Provider Reimbursement Review Board. *Id.*

The United States District Court for the Eastern District of Tennessee affirmed the determination that HAI and DHA were related organizations. *Id.* at 1388. The court found several factors in the record that amounted to substantial evidence in support of the decision of the Review Board. *Id.* at 1387–88. Among those factors, the court cited the $200,000 loan made to DHA for operating capital at a time when DHA had no assets; the influence HAI had over the administrator and comptroller of DHA, who were also its employees; the apparent fact that "HAI laid all the preliminary groundwork [for the transactions], and then, in a manner of speaking, created a buyer;" the evidence that the board of DHA had solicited no other bids for the management of the hospital; and the long-standing relationship between the companies. *See id.*

■ While each case challenging a related organization's ruling must be decided based on a cumulative consideration of the evidence before the administrative body, prior decisions help to illustrate what factors have been considered relevant to related organizations determinations. Both *Richlands* and *Hospital Affiliates* support the Board's consideration of the four enumerated factors in the present case. The Board could have found, from the evidence presented to it, that Howard Greenhawk was related to appellant through the long-standing business and personal relationship between appellant's owner, John R. Marcello, Jr., and Howard Greenhawk. This close relationship consisted of several acts of gratuity by Howard Greenhawk that inured to the benefit of Marcello and appellant. The Board could have found that, prior to Marcello's purchase of all of the stock in appellant Glasgow Nursing Home, Marcello moved into Greenhawk's home and paid no rent throughout the relevant period of this litigation. The Board could have found that the Greenhawks gratuitously assisted Marcello in obtaining a loan of $100,000 in 1983, by pledging the real property on which the nursing home was located as partial security for the loan. The Board also could have found that in 1985 the Greenhawks released Marcello from liability on a $200,000 promissory note given to the Greenhawks when Marcello purchased the stock in appellant.

An unsecured loan was important to the decision in *Hospital Affiliates*, and gratuitous rent increases were important factors in *Richlands*. The length of close association between the allegedly related entities was also a substantive factor in both of those cases. As in *Hospital Affiliates* and *Richlands*, the interaction between the health care provider and another organization in this case casts a shadow of collusion over the price that the entities agreed upon. Not all gratuitous actions between a Medicaid provider and another entity amount to substantial evidence of control. But the evidence in this case of a close, long-standing relationship between Howard Greenhawk and appellant, through Marcello, characterized by hundreds of thousands of dollars in total gifts to Marcello and appellant, constitutes substantial and sufficient evidence to

support the Board's conclusion that the organizations were related by control. From this evidence, particularly evidence of substantial business related assistance from Howard Greenhawk, the Board could have inferred the existence of a relationship of significant indirect control—that appellant, through Marcello, possessed indirect control over the financial decisions of Howard Greenhawk. Evidence relating to the fourth factor above, Howard Greenhawk's gratuitous reduction by $100,000 of appellant's outstanding principle balance on the real estate purchase, provides further support for the Board's determination. The Board could have inferred from this action that the original purchase price of the land may have been inflated by appellant and Howard Greenhawk, with an eye toward possible reimbursement from the Medicaid Program.

The evidence of this case implicates the concern surrounding "sweetheart" deals between a provider and another entity, a primary type of Medicare and Medicaid funding abuse that can occur when organizations related through control are not identified and compensated as such. *See Biloxi Reg'l Med. Ctr.*, 835 F.2d at 349–50; *Medical Center*, 628 F.2d at 1119. Of course, appellee did not have to establish below that the transactions cited involved actual abuse, so long as appellee demonstrated that, based on substantial evidence, the provider and supplying organization were related at the relevant times, thus giving rise to an opportunity for abuse. *Cf. Biloxi Reg'l Med. Ctr.*, 835 F.2d at 350; *Stevens Park Osteopathic Hosp.*, 633 F.2d at 1379.

Appellant cites prior cases involving the related parties issue and sample fact patterns available in the PRM to support its argument that "clear and concrete indicia of control" must exist before organizations may be found related. All of the cases cited by appellant involve either situations of common ownership or a relationship of control evidenced by a formal right to influence both provider and supplier. Appellant cites *Cuppett & Weeks Nursing Home v. Department of Health and Mental Hygiene*, 49 Md.App. 199, 430 A.2d 875 (1981); *Biloxi Reg'l Med. Ctr. v. Bowen*, 835 F.2d 345

(D.C.Cir.1987); *Richlands Medical Assoc. v. Harris,* 651 F.2d 931 (4th Cir.1981); and *Medical Center v. Harris,* 628 F.2d 1113 (8th Cir.1980). We believe the four factors considered by the Board reasonably could indicate a relationship of control, whether or not they constitute clear and concrete indicia of control.

In *Richlands,* which we discuss above, a professional association leased a hospital and employed one of the lessors as administrator of the hospital. Appellant points to the lessor's employment by the physician's association as an example of the type of concrete indicia of control necessary to support a finding that two entities are related. The Fourth Circuit based its decision on several factors, however, that led it to sustain the administrative determination that the association and lessors were related, including the "long-standing relationship between the parties." *Richlands,* 651 F.2d at 934. In discussing the employment of one of the lessors as administrator, the Fourth Circuit seemed to focus on the evidence that the lessor had used his position to suggest a major increase in rent years before the termination of the lease. *See id.* The Court did not conclude that the administrator's employment status was of paramount importance. Formal powers of influence likely are easier to prove in a given case, but are not necessarily dispositive. *Cf. Biloxi Reg'l Med. Ctr.,* 835 F.2d at 351–52 (mayor's power to veto a minority of members of a Medicare provider's board of directors regarded as a "courtesy"; such relationship extremely unlikely to result in influence by the mayor over the actions of the board). In *Richlands,* the gratuitous increases in rent appeared to benefit only the lessors. We find evidence of the financial benefits that Howard Greenhawk conferred on Marcello and appellant analogous to the situation in *Richlands.* The Board properly could infer that Howard Greenhawk's exceedingly generous actions appeared to benefit only Marcello and appellant, and that this was substantial evidence of a relationship of control. Under the definition of control it does not matter whether the provider exerts influence over the supplier, or is in some way influenced by the supplier. *See* 42 C.F.R. § 413.17(b)(3)

(1997). Both situations logically could produce a price that is not the result of arms-length dealing.

*(2) Interest Paid to Non-related Lender*

■ With respect to the second issue, the Board correctly stated that the loan obtained by appellant from Maryland National Bank could only be recognized, for reimbursement purposes, to the extent that it did not exceed the Greenhawks' cost basis for the property purchased, less depreciation, under 42 C.F.R. § 413.153. After a calculation of the Greenhawks' cost basis, appellant was appropriately compensated based on the portion of the loan that did not exceed that cost basis.

Appellant focuses on the holding of *Liberty Nursing,* that for purposes of reimbursement of interest expenses under 42 C.F.R. § 413.153, "the relevant transaction is the loan transaction, not the transaction giving rise to it," and that therefore "the critical relationship is that of lender to borrower, not seller to purchaser." 330 Md. at 447, 624 A.2d 941. Appellant construes this holding to support its argument that interest paid to an unrelated lender is fully reimbursable even if the parties to the underlying sale are related.

In *Liberty Nursing,* Michael DeFontes, majority owner of Liberty Nursing Center, bought the facilities leased by Liberty Nursing Center and the surrounding property from his grandmother's estate at a time when he was the administrator of the estate. 330 Md. at 436–37, 624 A.2d 941. The purchase was financed by a loan from First American Bank, an unrelated commercial lender. *Id.* at 437, 624 A.2d 941. In declaring that interest on the commercial loan could be reimbursed by Medicaid even though the parties to the underlying sale were related, the Court of Appeals noted the requirement that the loan be "necessary and proper" under 42 C.F.R. § 413.153(a)(1), and thus "reasonably related to patient care" under 42 C.F.R. § 413.153(b)(2). *Id.* at 446, 624 A.2d 941. The Court then discussed the limitation of § 413.153(d), entitled, *"Loans not reasonably related to patient care,"* and its application to the facts in *Liberty Nursing:*

This provision only precludes that portion of a loan, made to finance acquisition of a facility, that exceeds the cost basis of the facility, as determined under § 413.134(g), from being so considered, not the entire loan. There is no evidence in the record as to what the cost basis of the facilities was. Without that information, the Board could not have determined what, if any, portion of the loan and, hence, of the interest expense, should be disallowed....

*Liberty Nursing,* 330 Md. at 451 n. 14, 624 A.2d 941. As discussed in section IV. A., *supra,* 42 C.F.R. § 413.134(g)(4) limits the purchaser's cost basis to the seller's cost basis, less accumulated depreciation. The Court refused to construe a lack of sufficient information for an analysis under §§ 413.153(d) and 413.134(g)(4) as justification to eliminate all interest expenses in such a situation.

■■■ Although there was not enough evidence to determine the cost basis in *Liberty Nursing,* such evidence exists in the present case, and appellee limited the reimbursement to appellant accordingly. Section 413.153 deals generally with interest expenses, but its reference to the cost basis determinations of § 413.134 is explicit. Our application of the limitations of §§ 413.153(d) and 413.134(g)(4) is not inconsistent with the holding of the Court of Appeals in *Liberty Nursing,* but consistent with the Court's pronouncement on that issue. We now hold that where an underlying sale is between related organizations, §§ 413.153(d) and 413.153(g)(4) exclude reimbursement based on that portion of a loan that exceeds the seller's cost basis, less accumulated depreciation.

■■■ Appellant also argues that the Maryland regulation COMAR 10.09.10.10–O provides for an increase in valuation of assets such as the Nursing Home property that precludes application of the limiting provisions of §§ 413.153(d) and 413.153(g). We note that the regulation cited by appellant provides for a State cap on reimbursement of interest costs and in no way precludes application of the above federal regulations.

JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.